### DERR v. GLEASON.

(Court of Appeals of District of Columbia. Submitted May 14, 1919. Decided June 2, 1919.)

#### No. 1223, Patent Appeals.

1. PATENTS ⬤⟳91(4)—REDUCTION TO PRACTICE—CUTTING CURVED GEAR TEETH.
   Evidence that the junior party to an interference proceeding applied an attachment to a machine which traced a curved path, but that no attempt was made to cut curved gear teeth, etc., *held* to sustain concurrent decisions by the Patent Office tribunals that there was no reduction to practice.

2. PATENTS ⬤⟳91(4)—INTERFERENCES—EVIDENCE OF DILIGENCE.
   Evidence that the junior party to an interference proceeding renewed activities toward perfecting his device only after hearing of the senior party's progress, his failure to file an application until he had an invention which would probably supersede the prior art, etc., *held* not to sustain concurrent Patent Office findings that the junior party had been diligent.

3. PATENTS ⬤⟳91(1)—INTERFERENCES—JUNIOR PARTY MUST SHOW DILIGENCE.
   The junior party in a patent interference proceeding has the burden of showing that he acted with diligence.

4. PATENTS ⬤⟳113(6)—REVIEW—PATENT OFFICE FINDINGS OVERRULED.
   While, ordinarily, much weight is accorded concurrent decisions of the Patent Office, they will be overruled, where the court is convinced that an incorrect conclusion was reached.

5. PATENTS ⬤⟳1—NATURE OF RIGHT.
   A limited monopoly under the patent laws is granted to benefit the public.

6. PATENTS ⬤⟳90(2)—NECESSITY OF INVENTOR'S DILIGENCE.
   An inventor who slumbers on his rights does so at his own risk.

   Smyth, Chief Justice, dissenting.

Appeal from the Commissioner of Patents.

Interference proceeding in the Patent Office between Charles E. Derr and James E. Gleason. From a decision by the Commissioner of Patents in favor of Gleason, Derr appeals. Reversed, and priority awarded Derr.

Milton Tibbetts, of Detroit, Mich., and Frank Parker Davis, of Chicago, Ill., for appellant.

Harold E. Stonebraker, of Rochester, N. Y., and Melville Church, of Washington, D. C., for appellee.

ROBB, Associate Justice. Appeal from concurrent decisions of the Patent Office tribunals in an interference proceeding awarding priority

of invention to the junior party, Gleason; the ground of the decisions being that Gleason had shown priority of conception and diligence.

The invention is a method for cutting curved gear teeth (gears of that character now being very generally used in the rear axles of automobiles) and a machine for practicing the method. The issue is expressed in a number of counts, but counts 1 and 12, here reproduced, are sufficiently illustrative:

"1. The method of forming the side face of a curved gear tooth, consisting in causing a cutter to describe a curved path across the face of the blank and simultaneously producing relative rolling motion between the blank and cutter along the plane of the curved path of movement of the cutter."

"12. A gear-cutting machine, comprising a cutter, means for moving said cutter in a curved path in a plane, and means for rolling a blank along the plane of the curved path of movement of said cutter."

[1] The curved gear teeth covered by this invention are alleged to possess certain advantages over the straight teeth of the prior art, such as improved power transmitting capacity and reduced friction. Prior to this invention there were two well-known types of machines for making or "generating" the straight tooth bevel gears—the Gleason" and the "Bilgram." The Gleason Works, a corporation of which appellee was vice president, manufactured and sold the former, in which two reciprocating knives or tools would cut alternately upon opposite sides of the same tooth. Appellee was the patentee of that machine, and during the winter of 1910–11 designed and caused to be constructed for it an attachment that in June of 1911 was applied to the machine, and which, it is said, caused the single knife of the attachment to trace a curved path at each reciprocation of the knife. Strange to say, however, no attempt was made to cut a gear. Gleason contends that the construction and idle operation of this one tool or knife attachment constituted reduction to practice. Each of three tribunals of the Patent Office held that it did not, and of the correctness of their ruling we entertain no doubt. After this partial and, in view of the nature of the invention, unconvincing operation of the attachment, it was removed from the machine and not replaced until this interference was in progress, when it was operated. As the Examiners in Chief well suggested, the demonstration then made might have supplemented proof of a prior actual test, but could not take the place of such a test.

[2-6] In January of 1912 a wooden model of a supposed improved arrangement was completed by Gleason, and from that time until after Derr's entry into the field there was a period of total inactivity on the part of Gleason, a circumstance to which we shall advert later.

In May of 1912, or about four months after Gleason's activity entirely had ceased, Derr, a tool maker in the factory of the Packard Automobile Company, entered the field and by May 25th had completed drawings which the Patent Office tribunals found disclosed this invention. These drawings covered an attachment for the type of Bilgram machine in use by the Packard Company. Before June 20, 1912, the attachment had been constructed and gears responding to the issue actually generated. On June 20th a test of these gears was

started in the Packard plant, and on July 28th, following, a Packard car equipped with curved gears was sent from Detroit to the Pacific Coast as a further practical test. The trip was made and demonstrated the success of the invention. The Patent Office tribunals question whether it was clearly shown that the curved gears which were in this car were produced on the Derr machine. Witnesses have testified that they were, however, and it would be a rather violent assumption that they were not, for at that time no other machine for producing such gears was in existence. But the question is of no particular importance, for drawings were started shortly after this test was made and Derr's application was filed on October 11, 1912. It thus appears that within a period of about five months Derr designed, constructed, and successfully operated his machine and filed application thereon. Not only that, but the Packard Company immediately commenced equipping its Bilgrim machines with Derr's attachment, and thousands of curved gears were turned out and used in Packard cars,

In July of 1912 Gleason directed two of his draftsmen to design what is now known as the "1912 Special Generator." Mr. Gleason now says that this generator, which admittedly was a mere improvement upon the Gleason machine of the prior art, was to be equipped with an attachment for making curved teeth. Derr meets this contention with the observation that actions speak louder than words, and hence that Gleason's intent should be deduced from what he did, rather than from what he now says he intended to do. It is undisputed that the earliest date of any drawing disclosing Mr. Gleason's purpose thus to equip this special generator was January 17, 1913. All the drawings prior to that date were for a machine admittedly incapable of performing this invention. The tribunals of the Patent Office have been at a loss to understand why the 1912 generator was designed at all unless it was intended to equip this generator with the device for cutting curved teeth. The draftsmen who designed the special generator thought they were designing an improved generating machine, and so testified. This testimony, which evidently was overlooked by the Patent Office, offers a reasonable explanation for the designing of the 1912 machine. Moreover, other facts and circumstances irresistibly lead to the same conclusion, namely, that it was not until a much later period that Gleason determined to equip this special generator with the device of the issue. In November of 1912 Mr. Gleason learned of Derr's activity. He admitted, under cross-examination, that he then "heard that Packard was doing something in the line of spiral bevel gears." To a manufacturer of automobile gears, and a man so highly skilled in the art as was Mr. Gleason, that information was quite sufficient, and we are satisfied that it accounts for the renewal of his activity. The time intervening between this discovery of Derr's activity and the date of Gleason's drawings for an attachment embodying the invention was just about sufficient for the production of such drawings. Even then, Gleason did not file an application for patent until May 26, 1913, after he had devised a rotary cutter which was capable of producing curved gears with as great rapidity as prior machines could produce straight gears, and here, we think,

is the real secret of Mr. Gleason's long delay. He was not desirous of giving his invention to the world unless and until he could produce a machine that would enable him to monopolize the manufacture of automobile gears—a machine that would practically displace the machines of the prior art. This statement is made in the brief filed for him in this court:

"The key to the history of the development of Gleason's invention in interference, which must be constantly kept in mind, is his effort to produce a curved tooth bevel gear generator which the Gleason Works could manufacture and sell to the trade, and that such a machine must necessarily be as fast and economical in operation as his standard two tool straight tooth bevel gear generator on which 90% of such bevel gears were being cut. * * * Gleason knew, while Exhibit 11 (the attachment partially operated in June of 1911) was being designed and built, that it would be too slow for adoption as a commercially salable machine."

It thus appears that, after a period of almost a year's somnolence, Mr. Gleason was stirred into activity by knowledge that Derr was in the field. He testified that in 1911 he received an order for a large and unusual machine for use in producing gears for the Panama Canal gates, and that this work interfered with the completion of the invention of the issue. We are unable to accept this excuse. In the first place, Mr. Gleason now contends that he had completed his invention by successfully reducing it to practice in June of 1911. Certainly, he might have applied for a patent at that time. Assuming, therefore, that he had conceived the specific invention of the issue prior to Derr's entry into the field, we are constrained to hold that he has not sustained the burden of proof resting upon him as the junior party on the question of diligence. While, ordinarily, much weight is accorded concurrent decisions of the Patent Office, we ought not to hesitate to overrule them "where we are satisfied that an incorrect conclusion has been reached." Arbetter v. Lewis, 34 App. D. C. 491. A limited monopoly under the patent law is granted that the public may be benefited, and he who slumbers on his rights does so at his own risk. In the present case, when Derr entered the field, it was open, and, as he in good faith proceeded promptly to give the world the benefit of his discovery, we are convinced that under the law he is the prior inventor. Hubbard v. Berg, 40 App. D. C. 577; Brown v. Campbell, 41 App. D. C. 499.

The decision is reversed and priority awarded the senior party, Derr.

Reversed.

SMYTH, Chief Justice, dissents.