### GOODRUM v. CLEMENT.

(Court of Appeals of District of Columbia. Submitted November 18, 1921. Decided January 3, 1922.)

#### Nos. 1441–1444.

1. **Attorney and client ⊜125—Transaction in which attorney assumes antagonistic position closely scrutinized.**

   The relation of attorney and client is one of the highest trust and confidence, and demands the utmost good faith on the part of the attorney, and the courts will closely scrutinize any transaction in which the attorney has assumed a position antagonistic to his client.

2. **Attorney and client ⊜125—Patents ⊜91(1)—Attorney, claiming invention claimed by client, held to have burden of proof.**

   A patent attorney, filing an application for a patent on an alleged invention by him on which his client also seeks a patent, has the burden of proving his good faith, though his application was first filed.

3. **Patents ⊜91(4)—Evidence held to show client conceived invention and disclosed it to attorney.**

   In an interference proceeding between a patent attorney and a client, of whom the attorney had also been a partner, evidence *held* to show that the client conceived the invention and disclosed it to the attorney.

4. **Attorney and client ⊜125—Patents ⊜90(7)—Patent attorney could not file application relating to same subject-matter as client's invention, or profit by client's disclosure.**

   A patent attorney, who was also his client's partner, was precluded from filing any application of his own relating to the same general subject-matter to which his client's invention related, and, where the client disclosed the basic idea to him, could not profit by information that he

obtained at his client's expense, and his attempt to do so was a betrayal of trust, which could not avail him.

5. Patents ⚜113(1)—Contention that earlier decision is res judicata too late, when not made in Patent Office.

The contention in an interference proceeding that the decision in an earlier proceeding was res judicata came too late, when not made in the Patent Office, but first made in the Court of Appeals.

6. Patents ⚜112(4)—Interference decision not res judicata in subsequent proceeding involving broader issue and additional party.

The decision in an interference proceeding between two parties was not res judicata in a subsequent proceeding between three parties involving a broader issue, especially where the third party did not even contend that he could have claimed the narrower issue in the prior interference.

Smyth, Chief Justice, dissenting in part.

Appeal from a Decision of the Commissioner of Patents.

Interference proceeding between Charles L. Goodrum, Edward E. Clement, and Harry G. Webster, and interference proceeding between Harry G. Webster and Edward E. Clement. From a judgment in the three-party interference in favor of Clement, the other parties appeal; and from a decision in the other proceeding in favor of Clement, Webster appeals. Decision in the three-party case reversed, and priority awarded to Goodrum. Decision in the other case affirmed.

J. G. Roberts and G. W. Rich, both of New York City, and C. C. Bulkley, of Chicago, Ill., for Goodrum.

H. A. Dodge, of Washington, D. C., and W. G. McKnight, of New York City, for Clement.

Thos. H. Ferguson and Curtis B. Camp, both of Chicago, Ill., for Webster.

ROBB, Associate Justice. Nos. 1441, 1442, and 1443 are appeals from a decision of the Patent Office, in an interference proceeding, finding the party Clement to be the original and prior inventor of the subject-matter of the counts. The invention relates to the art of automatic telephony, in which, prior to this invention, the mechanism at the central station was controlled by a pair of relays for each telephone, and was known as a three-wire system. This invention dispenses with the use of a third wire by making one relay of each pair slow to release, and the other relay faster, so that, by properly timing the interruption of a circuit, one or both of the relays may be actuated. The issue is expressed in five counts, but the first, here reproduced, will sufficiently illustrate the group:

"1. In an automatic telephone system, a progressively movable switching mechanism, comprising a motor magnet and two relays controlling the operation of said motor magnet, one of which relays responds to impulses of current with greater rapidity than the other, in combination with a telephone instrument metallic circuit, and means for despatching current impulses thereover to operate said relays."

We first will consider the Goodrum and Clement applications. Prior to 1904 Goodrum had made inventions in the art of automatic telephony, and also had done considerable work in that art jointly with a Mr. J. W. Lattig. The efforts of these two inventors to exploit their

inventions having failed to progress as satisfactorily as desired, they entered into negotiations with the party Clement, a patent lawyer peculiarly skilled in this art, and who not only had made several inventions, but, in addition, had engaged in the manufacture of telephone apparatus. These negotiations resulted in a contract, dated August 1, 1904, under which Clement undertook to prepare and prosecute applications upon inventions in this art and to assist in disposing of them. For these services Clement was to be paid a sum covering his actual professional work and to receive a one-third interest in the remaining proceeds. The terms of this contract were enlarged later to include all the inventions of Goodrum and Lattig, as is evidenced by letters written by Clement. Under date of November 17, 1904, referring to a doubt as to whether a certain invention was "a joint or sole case," he wrote:.

"I am willing to handle this or any other inventions you may have under our continuing understanding as to the division of profits into thirds, I to have one-third."

On March 10, 1905, in a letter to Mr. Lattig in which he mentioned that he had "filed one of the Goodrum cases yesterday," he stated:

"We have agreed that I have a one-third interest in all the original inventions, and a one-fourth interest in the new ones."

That such was the arrangement of.the parties is so clear that we shall not dwell further on the evidence relating to it. The Assistant Commissioner, after alluding to the contract, these letters, and the contention of Goodrum "that a partnership relationship existed between Clement and Goodrum," said:

"I think that the contention that such a relationship is thus shown to have existed is well taken. Clement evidently entered into the further agreement with a view to benefiting by any additional inventions that Lattig and Goodrum might make, and which were not included among the original inventions, in view of which the memorandum agreement of August 1, 1904, was drawn."

There is no dispute that the parties, Lattig, Goodrum, and Clement, met at Atlantic City about the middle of August, 1904, for a conference, and that during the conference it was decided that a basic or omnibus application, covering as much of the work of these two inventors as could be covered in one application, should be prepared and filed. There also is no dispute that Clement was supplied then and there with all information necessary to the filing of that application, and that, as result, he filed an application on August 29th, following, known as the Grandfather Case. Goodrum and Lattig both testified that Goodrum then communicated to Clement an idea of means consisting in the employment of quick and slow relays in series in one circuit, as contradistinguished from the two-circuit arrangement of the prior art, and that Goodrum thereupon made a drawing illustrative of his conception. As the result of this disclosure Mr. Clement, according to the testimony of Goodrum and Lattig, said he could incorporate the general idea in the omnibus application he was to prepare "by calling these relays quick and slow."

It is undisputed that Clement placed the words "quick" and "slow" opposite two relays on Fig. 3 of the application drawings, but he denies having told Goodrum that protection could be obtained by thus designating these two relays. However, it is a fact that Clement has entirely failed to give any other explanation for the presence of these significant words on the drawings. That Goodrum was in possession of the invention at that time is testified to by John and Charles Erickson, witnesses whose character and credibility are unimpeached, who were skilled in the art and capable of understanding and appreciating such a disclosure. One of these witnesses testified that Goodrum made a sketch, which witness kept for some time, but finally lost. He produced from memory, however, a copy of the sketch which disclosed the invention. The date was fixed by him with reference to the time he left the employ of one firm and entered that of another. That the basic idea underlying the invention was present in the mind of Goodrum prior to the Atlantic City meeting is conclusively shown by a letter he wrote Lattig on July 18, 1904, in which he said:

"Now have system in mind [that automatic] that will send all signals over the two wires, doing away with the ground at subscriber's station; how is that?"

A witness by the name of B. G. Dunham, a telephone engineer, produced a letter addressed to him under date of June 6, 1905, and signed by Goodrum, containing a description of the two-wire system. Dunham testified that he understood the disclosure sufficiently well to enable him to set up switches embodying the new idea. There is no reason to doubt either the authenticity of this letter or the testimony of Mr. Dunham as to what he did. Later, in May of 1906, a system embodying the issue was installed, under the direction of Goodrum, in the Ellis Hospital at Schenectady, N. Y., and it may be noted here that no other party actually has reduced the invention to practice.

On December 9, 1905, Clement, who then sustained the relationship of attorney and partner to Goodrum, filed an application covering the invention of the issue, a fact which, so long as possible, he concealed from Goodrum. In this connection it will be well to keep in mind that Clement testified that Goodrum not only failed to make a disclosure to him at Atlantic City, but that no such disclosure was made by Goodrum at any time prior to the taking of testimony in this case. His denial was in these words:

"His [Goodrum's] statement is absolutely without foundation. He not only made no disclosure to me then, at that time, of any such thing, but he never made it at any other time prior to the present. Any statement to the contrary is either a serious mistake or a deliberate falsehood."

We come now to the correspondence between these parties. On February 16, 1906, Goodrum wrote his partner and attorney, Clement, in part as follows:

"I thought it would be of interest to you to know I have finished my drawing of the metallic circuit system, using only the two wires and no ground. * * * I have tried it out, and it is all one could desire. * * * The new two-wire system will reach you in a very few days through the regular channel."

It will be obvious that this letter referred to the system of this issue and must have been so understood by Clement. Indeed, as found by one of the tribunals of the Patent Office, the phraseology of the letter clearly indicates that Clement already was advised of Goodrum's activity along that line. To this letter Clement replied, on the 19th, in part as follows:

"Your valued favor of the 16th is received. Am glad to hear of your progress and trust to see you soon. I would suggest that you hold up any further systems until I have the opportunity of taking up matters with your people there, and have some definite arrangement which will be satisfactory."

One month earlier Clement had alluded to the very definite arrangement existing between the parties, an arrangement which was in full force when this letter was written. On May 8th, following, in a letter to Lattig, Clement wrote:

"You will recall that I told you some time ago I had some other clients who own some automatic systems and apparatus, and that in case it seemed desirable at any time I thought you could take advantage of their devices under licenses. * * * I am, of course, entirely unaware who all the other parties are; but I think it quite likely that the Office has gathered up a large bunch, and I suspect that the Chicago automatic crowd is in it."

To this letter Lattig responded with a request that Clement—

"kindly advise us of what these systems and apparatus consist, so that we may be able to intelligently consider the question as to whether or not we would desire to negotiate for the same."

On May 14th, following, in answer to this letter, Clement stated:

"As far as I am at present advised, there are no other systems in my custody which are the same as yours."

Under date of May 16th, in another letter to Lattig, Clement said:

"With regard to the metallic circuit system, no one has been able to get any broad claims on this, and no one will."

Shortly after this Goodrum came to Washington for the purpose of having Clement prepare certain applications, including the two-wire system. He testified that he then showed Clement his drawings and explained the invention to him in detail; that, finally, Clement said—

"he was in a very peculiar position, and that he was afraid he would be unable to file this case, as well as the others, and asked to delay until he had time to think it over a little bit."

Later, according to Goodrum's testimony, Clement informed him that other clients objected to having him prepare the application for the two-wire system. Clement, however, declined to disclose the identity of his other clients, and refused to answer an inquiry by Goodrum as to whether he (Clement) was the inventor. On June 4th, following, Clement wrote Lattig:

"Mr. Goodrum left here Saturday, and most of the descriptive matter for your new system case was written while he was here. I regret to say that, from what he tells me, that system case is in the same line of work which I have in my hands for other clients, even if it does not actually interfere. In order to secure myself against the possibility of criticism, I have communicated with the other clients as soon as I had an idea of what was in this

system, and they strenuously object to my proceeding in any doubtful case. The papers in the case have been sealed up and forwarded by express."

Under date of June 8th Clement again wrote Lattig, saying:

"You will kindly recall that I had no information *as to the nature of the means employed* in your metallic circuit system until recently; but, as it happens, it would not have changed the situation, even if I had." (Italics ours.)

Further correspondence of a cumulative nature followed, but we need not detail it here.

The Examiner of Interferences awarded priority to Goodrum, but the Examiners in Chief and the Assistent Commissioner, proceeding upon the theory that, as between Clement and Goodrum, the burden was upon Goodrum, because Clement's application antedated his, found that Goodrum had not sustained the burden, and accordingly awarded priority to Clement.

[1, 2] The relation of attorney and client is one of the highest trust and confidence, and demands the utmost good faith on the part of the attorney. This relation is not only highly confidential, but presents so many opportunities for the reaping of special benefits at the expense of the client by an attorney so disposed, that courts will closely scrutinize any transaction in which the attorney has assumed a position antagonistic to his client. And where, as here, the evidence shows that as a result of assuming such a position the attorney has gained an advantage, the burden is on him to prove good faith, rather than on the client to prove the absence of it. Overholt v. Matthews, 48 App. D. C. 492. In Milton v. Kingsley, 7 App. D. C. 531, where only a partnership relationship existed, and one partner had communicated the general plan and underlying basic idea of means for an invention to his copartner, who thereafter claimed to be the inventor of an improvement on that basic idea, the court ruled that the invention belonged to the first partner, saying:

"It is in direct antagonism to the fundamental theory of the law of partnership that one partner should, without the consent of his copartners, carry on for his own exclusive advantage any business within the scope of the business of the partnership."

Even greater reasons obtain for denying such a privilege to one who sustained the double relation of attorney and partner.

[3] That Goodrum had conceived this invention prior to the meeting at Atlantic City in 1904, we think, is established. The testimony of Lattig and the two Ericksons, and the letter from Goodrum to Lattig under date of July 18, 1904, all indicate this. That Goodrum fully disclosed his idea to Clement at that meeting we regard as equally well established. He says he did, and on this point Lattig and the surrounding circumstances strongly corroborate him. For some reason the words "quick" and "slow," which have a peculiar significance in this art, were placed in the Grandfather application by Clement at the request of Goodrum. Goodrum and Lattig have told us why this was done; but Clement, the lawyer and confidential adviser, is yet to be heard from with any degree of satisfaction on this point, although, as

we have seen, the burden was· on him to establish his good faith. While he testified positively that never, down to the taking of ·testimony in this case, did Goodrum disclose the invention to him, his own letters so clearly contradict him that his testimony throughout is not entitled to the weight it otherwise might have. In those letters he clearly admitted he had derived knowledge of this invention from Goodrum at least as early as May of 1906. His attitude toward his client was characterized by bad faith almost from the first. On February 16, 1906, Mr. Goodrum in terms alluded to "my drawing of *the* metallic circuit system using only the two wires and no ground." (Italics ours.) Instead of promptly notifying his client that he (Clement) already had on file an application covering the invention, he expressed his gratification at the progress of his client, but cautiously suggested a delay on the part of the latter, and not until several months later, when circumstances compelled, did he disclose to his client and partner his real attitude. If such conduct on the part of an attorney, and particularly a patent attorney, whose opportunities for personal gain as the·result of the relation, are perhaps even greater than those of a general practitioner, may' go unrebuked, and the attorney be permitted to profit thereby, courts of justice will have ceased to function.

[4] We have not entered upon a technical consideration of the claims of the issue and the precise extent of the disclosures by Goodrum, because we have deemed such a course unnecessary. As the attorney and partner of Goodrum, Clement clearly was precluded from filing any application of his own relating to this general subject-matter, and when Goodrum, as the evidence clearly shows, disclosed the basic idea to him, Clement could not thereafter profit by information thus obtained at the expense of his client. His attempt to do so was a betrayal of trust, which cannot avail him here. In such circumstances, ·it is quite immaterial that he preceded his client in the Patent Office. He has wholly· failed to sustain the heavy burden resting upon him, and we rule, therefore, that, as between Goodrum and himself, Goodrum is the real inventor.

Coming now to the case of Webster, we accept the finding of the Patent Office that he conceived the invention in July, 1905, and we agree with the Examiners in Chief and the Assistant Commissioner that he was wholly lacking in diligence for more than a year thereafter, during which time his assignee, the Kellogg Company, filed 22 applications in the Patent Office covering his inventions. See Derr v. Gleason, 49 App. D. C. 69, 258 Fed. 969; Clement v. Roberts, —— App. D. C. ——, 273 Fed. 757.

[5, 6] It developed during the argument of this case that Webster and Goodrum were parties to an interference proceeding in which priority was awarded Webster on counts narrower than the counts here involved, and it now is suggested that the decision is res adjudicata here as between Webster and Goodrum. In the first place, this contention comes too late, as it should have been made in the Patent Office; but it is apparent that, had it been made seasonably, it would have. availed. Webster nothing, for the obvious reason that neither the issue nor the parties are the same. Moreover, the third party here does

not even contend that he could have claimed the narrower issue in the prior interference.

In No. 1444 the party Webster appeals from a decision awarding priority of invention to Clement. The counts are 8 in number, and differ somewhat from those of the three-party interference. The Assistant Commissioner, upon the same evidence he reviewed in the three-party cases, held Webster lacking in diligence. We have carefully considered and given due weight to the well-prepared brief of counsel for Webster and the evidence in the record, but, as in the three-party cases, we have found no reason to disturb the ruling of the Patent Office on this point.

In Nos. 1441, 1442, and 1443, the decision of the Patent Office is reversed, and priority of invention awarded Goodrum. In No. 1444, the decision of the Patent Office is affirmed.

Reversed as to Nos. 1441, 1442, and 1443.

Affirmed as to No. 1444.

SMYTH, Chief Justice, dissenting in part. See 278 Fed. ——.

Mr. Justice HITZ, of the Supreme Court of the District of Columbia, sat in the place of Mr. Justice VAN ORSDEL in the hearing and determination of this appeal.