Robert C. **FIELDING**, Appellant,

v.

John Henry **BREBBIA** and George D. Webster.

No. 71–1899.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 17, 1972.

Decided April 17, 1973.

Rehearing Denied June 11, 1973.

---

David Brady, New York City, of the bar of the Supreme Court of the United States, pro hac vice, by special leave of court, for appellant. William W. Scott, Washington, D. C., was on the brief for appellant. E. David Doane, Washington, D. C., also entered an appearance for appellant.

Jacob A. Stein, Washington, D. C., with whom Carl W. Berueffy, Washington, D. C., and Arthur V. Butler, Wheaton, Md., were on the brief, for appellees.

Before WILBUR K. MILLER and DANAHER, Senior Circuit Judges, and WRIGHT, Circuit Judge.

DANAHER, Senior Circuit Judge:

In a non-jury trial before Judge Gesell, appellant's counsel submitted as issues framed at pre-trial:

"One, is there an attorney-client relationship between these defendants and Mr. Fielding; and, if so, did they come to sue him in subject matter which is substantially related to the prior representation."

Judge Gesell concluded after trial that Fielding "on the case as a whole failed to sustain a cause of action on the merits and that, of course, is the end of the litigation." Alternatively, he found that a question as to the effect to be given to the New York "release" [1] had been properly raised at pre-trial, and then held that New York law required the conclusion that "the document released not only the individual named [Heymann] but the other two Defendants [Brebbia and Webster]."

---

1. The original complaint against Brebbia and Webster filed in the District of Columbia as of July 25, 1967 had been dismissed by order entered November 2, 1967. An essentially similar complaint, signed by Fielding and verified August 23, 1967, was filed by Fielding against Brebbia, Webster and one Henry H. Heymann, a New York attorney, in the Supreme Court for the County of New York. In due course Fielding and Heymann entered into an instrument variously herein designated as a release or covenant not to sue.

This appellant now on brief "challenges the conclusions of the trial court, not its findings of fact," and explains that, accordingly, "no attempt was made to challenge the trial court's findings as being 'clearly erroneous.'" Appellant thus argues that the factual findings do not support, first, "the conclusion that an attorney-client relationship was not established between Brebbia and Fielding," and, next, the conclusion that "the actions of Webster (and Brebbia) could not be construed as a breach of fiduciary duty to Fielding which would justify a judgment for damages."

## I

As we thus define our present involvement, it is trite to say it is only the summit of the iceberg. Even so, for background purposes, it is possible to discern enough to glean a reasonable measure of understanding as to what circumstances gave rise to the dispute now in litigation.

Among the partners in the Davies law firm were Alfons Landa and Delmar Holloman when in 1958–1959 Holloman was asked by Fielding to meet with one Albert G. Neumeyer of Las Vegas. The latter sought business advice and financial assistance with particular reference to a Nevada corporation known as First Western Savings and Loan (herein Savings & Loan). Landa and Fielding were already coventurers in certain enterprises. They were not averse to consideration of the possibilities presented by the Neumeyer project.

Holloman was later to testify in this case that Landa and Fielding had in mind a participation amounting to a million and a half dollars, ostensibly as a loan, but "at the same time," certain options and contingencies were involved. If all materialized as planned, he said, "they" would wind up owning some 60

per cent or more of a Delaware corporation to be formed, First Western Financial Corporation (herein "Financial"), of which Savings & Loan would become a wholly owned subsidiary.

The Davies firm as of April, 1961, became counsel in working out a public underwriting of stock for Financial, and so continued as counsel over the next several years. George D. Webster became a partner in the Davies firm in 1960.

From 1960 to 1966, Fielding was president and director of Financial. Webster became assistant secretary. By 1965, pursuant to a Nevada statute, the state organized Savings & Loan was required to qualify for federal insurance backed by the Federal Savings and Loan Insurance Corporation.

Meanwhile, as of January, 1965, Brebbia became an associate in the Davies firm, and with Financial's interests at stake, Brebbia, Fielding and Webster attended meetings with representatives of the Federal Home Loan Bank Board. It had developed that Savings & Loan was in trouble and an "assistance agreement" was to be negotiated. An official audit, commenced in 1966, disclosed a shrinkage of assets of some $20,000,000.

As noted in our earlier opinion,[2] Fielding alleged he had been advised in 1966 to sever relationship with Financial. Webster, with the Federal Savings and Loan Insurance Corporation having authority to approve, and with the affirmative support of Fielding, became a director of Financial, and Brebbia in December, 1966 became a director, vice-president and general counsel of Financial. He also became a director of Savings & Loan.

Brebbia[3] thereupon began an investigation of the conduct of the affairs and of the management of Savings & Loan. The successor Board of Directors of Savings & Loan voted that a lawsuit be

2. Fielding v. Brebbia, 130 U.S.App.D.C. 270, 399 F.2d 1003 (1968).

3. For a discussion of the duties of a director of a corporation, see Pepper v.

Litton, 308 U.S. 295, 311–312, 60 S.Ct. 238, 84 L.Ed. 281 (1939).

filed against Fielding and others; indeed, Judge Gesell found:

" . . . it is certainly clear that the suit which was generated by, in effect, the demand of the Federal Savings and Loan Insurance Corporation, in its letter of March 10, 1967, was not based on any information that Mr. Webster and Mr. Brebbia, or either of them, obtained in a confidential way through any contact with Mr. Fielding other than as counsel for First Western in the normal course of that representation which Mr. Fielding had approved."

In May, 1967 the suit brought in the Nevada state court charged waste and mismanagement of Savings & Loan on the part of the *former* management, naming among the defendants, Neumeyer and Fielding. Over-valuation of properties on which loans had been made ran into the millions, it was alleged. That state court suit was finally dismissed as to Neumeyer and Fielding, but their motion that the dismissal be "with prejudice" was denied. The Savings & Loan claim was assigned to the governmental agency, Federal Savings and Loan Insurance Corporation, which thereupon commenced action in the United States District Court in Nevada against Fielding and others. The District Court rejected the defense argument that the claim against the former management could not validly be assigned.[4]

When Neumeyer died, his executrix, his widow, over objection was substituted as a party.[5]

In the latest (May 10, 1972) of the series of opinions in the United States District Court in Nevada, Judge Thompson with infinite pains has drawn together threads and skeins of circumstances developed over the years. The final fabric delineates a picture as clear as earlier isolated aspects of the relationship might have seemed devious.

Judge Thompson concluded that executives of the involved corporate entities and former partners in and the associate of the law firm which had been counsel to the corporations were not disqualified from participation officially in an action against the former management. The officers and directors of a company, he concluded, were bound to exercise a duty reflecting utmost confidence and trust to the corporation and its stockholders. The *corporation* is the client, he pointed out. He saw what, in essence, is our situation here, concluding that business confidences of business partners lack the protection of professional privilege. *See generally*, Federal Savings and Loan Insurance Corp. v. Fielding, 343 F.Supp. 537 (D.Nev.1972), and particularly, 546.

We think Judge Gesell here in July, 1971, had sensed precisely what had been happening and what underlay the controversy before him, much as did Judge Thompson in May, 1972.

While the various corporate matters had been running their course, Fielding had personally received certain services from members or associates of the Davies firm. They drew wills for Fielding and his wife, set up various corporations not connected with Financial, gave advice to Fielding as to taxes and that sort of thing. No charge was made for such services, indeed even when Holloman prepared the papers attendant upon acquisition of Financial, Fielding was not billed.

Appellant's counsel has pointed to Canons 6 and 37 of the ABA Canons of Professional Ethics and has contended that the mere fact that Webster and Brebbia had given legal advice to or performed some services for Fielding in such unrelated respects established a breach of fiduciary duty to *him*.

The transcript shows that the trial judge repeatedly sought to ascertain what professional secrets had been revealed by Webster and Brebbia. "I'm

---

4. Federal Savings and Loan Insurance Corp. v. Fielding, 309 F.Supp. 1146 (D. Nev.1969).

5. Federal Savings and Loan Insurance Corp. v. Fielding, 316 F.Supp. 82 (D.Nev. 1970).

not interested in legal services in general—but whether there were any involving confidential disclosure." Again, to paraphrase, what confidential disclosures did Mr. Fielding make to the Davies firm which have any bearing on the subsequent litigation? "That is what I want to know," said the judge.

Appellant's counsel replied: "We don't have any secrets which we are going to identify in this trial that we told to this law firm and which were later used against Mr. Fielding."

In culmination of all that had gone before, by March 10, 1967, the Director of the Federal Savings and Loan Insurance Corporation addressed a letter to the Board of Directors of Savings & Loan. He made it clear that

"as directors you have the duty and opportunity of making appropriate investigations and judgments as to whether the facts and circumstances justify the assertion of claims against bonding companies, former officers, directors . . . and the institution of appropriate legal actions . . . to compensate the association for the damages it has suffered."

█ There was more, but we have said enough to demonstrate why Judge Gesell could surmise that the letter "generated" action. Webster and Brebbia about March, 1967, terminated their connection with the Davies firm after an agreement had been reached as to finances and the firm turned over to them the files dealing with the business of Financial. Some of Fielding's papers dealing with his personal business were deemed by the judge to have been "inadvertently" included, but no injury to Fielding was shown to have occurred on that account. Besides, the judge observed, there was no indication that Fielding's *personal* papers had any real bearing on the litigation. Moreover, a trial judge in Nevada could determine their pertinency, if any, and exclude them if necessary. Meanwhile, all files had been impounded, Fielding could have access to them, and "full and complete remedies were available in the Nevada litigation." We see no error in Judge Gesell's appraisal of the problem.

The state court action came to naught. Webster's involvement had ceased. While he and Fielding were dealing with the affairs of Financial, both were serving its corporate business. Both were paid by Financial. Webster was where he was with Fielding's support. There simply was no privilege involved. Indeed, the judge commented:

" . . . There is no manner in which an attorney can represent a corporation without dealing with the individuals, particularly the officers and directors who are responsible for its policies and responsible for the conduct of its affairs."

We think that conclusion inevitable on the record before us.

II

The Transcript shows that the District Judge in colloquy with Fielding's counsel remarked:

I indicated at the beginning of this trial that I was prepared to take testimony bearing on [the issue of release and discharge]. I am asking you now, do you want me to decide it on the formal papers?

[Counsel]: May I confer with my client for a moment?

A recess was then taken after which the judge was informed that the appellant would "rest on the documents."

The foregoing discussion related to Fielding's New York suit[6] against Webster, Brebbia and Henry M. Heymann, all of whom as attorneys were alleged to have represented Financial and Savings & Loan and to have become three of the four directors of both corporations. All were charged as in this action.

---

6. *See* note 1, *supra*, and related text.

The trial judge in his oral opinion stated:

A study of the complaint which the Court has carefully made satisfies the Court that the complaint is framed in a manner that alleges that the three attorneys were joint tort feasors and, therefore, with these clear allegations and the explicit nature of the New York statute, an alternative ground for granting judgment at this time to each defendant will be based on the fact that there was a . . . decisive release of the issues raised in this complaint.[7]

In the New York courts Fielding and Heymann had jockeyed for priority in proceeding with pre-trial examination of each other until Mr. Justice Nunez took charge. He ordered Heymann's examination of Fielding to proceed on a fixed date. Our record shows that Fielding and Heymann thereafter entered into an agreement mutually terminating their respective claims, reciting that they "are desirous of ending all disputes between them without further litigation."

They described that document as a "covenant not to sue" and as "not intended and shall not be construed as a release." But their recitation went one step further: *"This agreement shall be construed in accordance with the laws of the State of New York and may not be changed orally."* (Italics ours.)

*There was no reservation of claims against others.*[8]

Fielding is an attorney admitted to practice in New York. He had shared offices with Heymann. He was a principal in many ventures including his holdings in Colt Industries which controls various subsidiaries, for example, Colts Patent Firearms Company. It is clear enough that the trial judge could readily perceive he was no novice.

■■ It is the "settled law" of New York "that the release of one of several joint tort-feasors, without reserving any claim against the others, releases all," wrote the court[9] in Rushford v. United States, 204 F.2d 831, 832 (2d Cir. 1953), citing Milks v. McIver, 264 N.Y. 267, 190 N.E. 487 (1934).

The New York ruling explaining the effect of its distinction between a release and a covenant not to sue may further be discerned in Gilbert v. Finch, 173 N.Y. 455, 66 N.E. 133 (1903).[10] There, at 466, 66 N.E. at 135, the court pointed out that an agreement which *expressly* reserves the right to sue others is a covenant not to sue and those others will not be discharged; but such an instrument releasing one, *without a reservation of rights against others*, operates to discharge all joint tort feasors.

■ That the basic New York rule is more rigid than our own[11] is obvious, but we cannot ignore the fact that these New York attorneys, in New York, agreed that the law of New York was to govern their agreement. There was no reservation by Fielding of a claim against Webster and Brebbia, and Judge Gesell correctly decided that "as a matter of New York law the document released not only the individual named [Heymann] but the other two Defendants."

Appellant would have us say that the judge erred in light of Plath v. Justus, 28 N.Y.2d 16, 319 N.Y.S.2d 433, 268 N.E.2d 117 (1971). There the court, at 28

---

7. We can readily concur in the trial court's assessment of the effect to be accorded to the respective complaints.

8. As noted, *supra*, Judge Gesell gave Fielding an opportunity to testify respecting his position as to the agreement, but he declined to do so.

9. Judges L. Hand, A. Hand and Jerome Frank, reviewing Rushford v. United States, 92 F.Supp. 874 (N.D.N.Y.1950).

10. *And see* Sagan v. State, 205 Misc. 435, 128 N.Y.S.2d 924, 926 (Ct.Clms. 1954). *Cf.* Western Newspaper Union v. Woodward, 133 F.Supp. 17, 25 (W.D. Mo.1955), where Judge Whittaker (later Mr. Justice) has commented upon New York law.

11. Mere nomenclature does not control; the facts and the intentions of the parties will. McKenna v. Austin, 77 U.S.App. D.C. 228, 134 F.2d 659 (1943).

N.Y.2d at 22, 319 N.Y.S.2d at 437, 268 N.E.2d at 120, restated its general rule:

> Where a release has been given *but the releasor reserves the right to proceed against other wrongdoers,* we believe effect should be given to the *intention* of the parties as expressed by these reservations and allow the suit against any defendant not a party to the release. (Emphasis supplied).

The court then went on to give effect to the intention of the parties, for the reservation of rights over was clearly to be discerned, and the instrument was not to be treated as a release. The opinion offers no aid to the appellant in the situation before us.[12] Moreover, the appellant spurned the opportunity to try to bring himself within the rule as stated in *Plath.*

Without further discussion which would unduly extend our treatment perhaps already too diffuse, we have carefully considered appellant's every claim and find ourselves constrained to order that the judgment of the District Court be

Affirmed.

---

12. Other cases cited by the appellant have been considered but are clearly distinguishable. *Compare, e. g.,* Doe v. A Corp., 330 F.Supp. 1352 (S.D.N.Y.1971), aff'd sub nom. Hall v. A. Corporation, 453 F.2d 1375 (2d Cir. 1972), where the facts are not even remotely comparable to the situation here. *See also* Richardson v. Hamilton International Corporation, 469 F.2d 1382 (3 Cir. 1972), cert. denied, 41 L.W. 3608 (May 15, 1973).