Thomas J. EGAN, as Executor of the Estate of Paul J. Rohrich, et al., Appellants,

v.

Richard V. McNAMARA, Francis J. Bowman, Answering Service, Inc., Appellees.

No. 81–1271.

District of Columbia Court of Appeals.

Argued April 22, 1983.

Decided Oct. 6, 1983.

William E. Fay, III, Washington, D.C., and Thomas P. Brown, III, Bethesda, Md., for appellants.

Kenneth Wells Parkinson, Washington, D.C., with whom David H. Cox, Washington, D.C., was on brief, for appellees.

Before NEWMAN, Chief Judge, and MACK and FERREN, Associate Judges.

NEWMAN, Chief Judge:

Simply stated, this is an appeal from the trial court's order upholding the validity of a buy-sell agreement entered into by Paul J. Rohrich (Rohrich), Richard V. McNamara (McNamara), Francis J. Bowman (Bowman), and Answering Service, Inc. (ASI). Appellants, the Executor and the Estate of Rohrich, challenge: (1) the trial court's refusal to find a fiduciary relationship between McNamara and Rohrich regarding the buy-sell agreement; (2) the trial court's failure to require ASI to continue to redeem stock under a corporate resolution permitting redemptions in conformity with Section 303 of the Internal Revenue Code; (3) the trial court's refusal to construe the buy-sell agreement to require installment payments; and (4) the trial court's approval of the inclusion of certain shares owned by McNamara and Bowman in the valuation of ASI stock at the time of Rohrich's death. We affirm.

The particular issues on appeal arise from the following events. ASI was incorporated in Delaware on December 31, 1958. Two days later the newly constituted corporation issued all its stock (250 shares at $100 par value) to Wesley I. Steele (Steele) and Rohrich as joint tenants with right of survivorship. Some years later Steele died, leaving Rohrich as the sole owner of all 250 shares.

Following Steele's death, Rohrich asked McNamara to give up his private law practice and to join ASI as officer, director, and general counsel.[1] McNamara agreed to do so upon ASI's guarantee of certain conditions.[2] Rohrich, in his capacity as Executor

---

1. Rohrich and Steele had both known McNamara, an attorney, for some years. Indeed, in 1965 McNamara drafted a joint will for them.

2. ASI agreed to provide: (1) a minimum salary of $25,000, plus a profit sharing plan for 5% of the pre-tax profits of the company; (2) a written employment contract; and (3) an annual audit of the company by an outside accounting firm.

of Steele's estate, also asked McNamara to assist in the administration of that estate. Although McNamara agreed to do so, it soon became apparent that Steele's status as a New Jersey domiciliary and the fact that his property was dispersed in New Jersey, New York, Pennsylvania, Florida, and the District of Columbia, required that counsel licensed in those jurisdictions be engaged to represent the estate. McNamara prepared a list of attorneys with the requisite qualifications from which Rohrich chose Bradley Walls (Walls) to represent him as the executor of Steele's estate. Walls, in turn, delegated the responsibility of representing the estate to his associate, John Keegan (Keegan). McNamara received no compensation for the assistance he provided Rohrich regarding the Steele estate and had no power of attorney to represent the estate before the Internal Revenue Service. To provide additional assistance in connection with the administration of the Steele estate, Rohrich hired William C. Sabin (Sabin), a CPA and tax partner with Arthur Young & Co. Sabin has a law degree and is an expert in the field of taxation.

As the owner of all ASI's stock following Steele's death, Rohrich had personal "transferee" liability for a portion of the federal estate taxes due on the Steele estate. In order to secure for Rohrich the cash to pay these taxes, ASI's Board of Directors[3] established a stock redemption plan on January 1, 1971, in conformity with Section 303 of the Internal Revenue Code. As a result of several redemptions over the succeeding years, Rohrich's ownership of the 250 shares of ASI stock decreased until, at his death, he owned 169 shares.

During the course of the administration of the Steele estate, Rohrich began to give consideration to the development of a plan for his own estate. The will that McNamara had drafted in 1965 had set up a charitable trust to receive the corporation's stock at Rohrich's death in the event that Steele predeceased him. Due to changes made by the Tax Reform Act of 1969, however, the trust would no longer be able to hold the stock, thus forcing its sale. To remedy the problem, Keegan prepared a new will nominating McNamara as co-executor and providing for the transfer of all Rohrich's assets to a newly established charitable foundation. McNamara and others were named trustees of the foundation. Rohrich executed the will on April 23, 1971, together with a codicil prepared by McNamara.

McNamara testified that during this period of extensive estate and corporate planning, Rohrich said he had two major concerns. The first was the continued existence of ASI after his death, and the second, his retention of full control of ASI during his lifetime. With these objectives in mind, Rohrich caused ASI's Board of Directors, on June 1, 1971, to amend the corporation's Certificate of Incorporation to increase the authorized stock to 1250 shares. Bowman, who had been Rohrich's and Steele's secretary, and McNamara then purchased ten shares each of the newly authorized stock. They each provided consideration of $22,880 in the form of a cash downpayment of $2,288 and a promissory note due June 30, 1981. This was done on November 18, 1971, four days before the November 22 filing of the Certificate of Amendment. Thereafter, Bowman and McNamara made four annual payments of $2,288 each on their notes. The notes were paid in full on December 31, 1975.

Rohrich also decided that a buy-sell agreement would further his objectives.[4] He conferred several times with Sabin, who

---

3. During the period 1959–1969, the sole officers of ASI as well as its sole directors, were Rohrich and Steele. In January 1970, Bowman was elected treasurer and on June 23, 1970, vice-president and assistant secretary. McNamara became vice-president, general counsel, and secretary on June 23, 1970.

4. Rohrich was apparently familiar with such agreements as he had executed a similar agreement with All World Travel, Inc., on January 1, 1971.

then prepared a buy-sell agreement. McNamara testified that he reviewed the document, that he transmitted a copy of it to outside counsel for review, and that he told Rohrich to seek the opinion of outside counsel as to it. McNamara testified further that he expressly told Rohrich not to rely on him as counsel since he was party to the agreement.

On June 4, 1971, ASI, Rohrich, Bowman, and McNamara entered into the buy-sell agreement (Agreement). The Agreement, as was intended, restricted the transferability of stock and required the corporation to purchase the stock of any deceased or withdrawing stockholder. In addition, it contained a provision stating that it did not prohibit the redemption of Rohrich's stock, for Section 303 purposes, on behalf of Steele's estate. The Agreement also contained the following provisions regarding when and upon what terms ASI would purchase shares:

> Upon the death of any stockholder, the Corporation [ASI] *shall* purchase ... *all of the common stock* of the deceased stockholder.
>
> \*     \*     \*     \*     \*     \*
>
> As soon as the purchase price of the decedent's common stock has been determined, the Corporation *shall pay* ... an amount not in excess of the purchase price .... In no event shall the amount referred to in the preceding sentence be less than 1% of the purchase price.
>
> The amount by which the purchase price exceeds the amount paid ... shall be satisfied by the Corporation no later than 15 years from the date of death. The amount of such excess shall be evidenced by the Corporation's 4% Promissory Note payable in intervals of no less than one year, beginning with the date of death (emphasis added).

Rohrich died on December 7, 1975. ASI then purchased his 169 shares of stock at $5,733 per share in accordance with the formula provided in the Agreement. That formula set the purchase price at "the book value of all of the outstanding common stock of the Corporation as of the year immediately preceding the date of death or a capitalization rate of 12½ percent of the prior five years earnings ...." According to Sabin's calculation, then, there was a total of 193 shares outstanding as of the end of 1974, the year preceding Rohrich's death. Included in that figure were the twenty shares owned by McNamara and Bowman. ASI made a payment to Rohrich's estate of $9,787.62 (one percent of the purchase price) and executed a promissory note for $968,974.19. After Rohrich's death, ASI refused to make any further payments of federal estate taxes due on the Steele estate.

On March 9, 1976, ASI, McNamara, and Bowman filed a complaint for interpleader, injunctive and declaratory relief. The complaint sought a determination of which defendant, if any, was entitled to the assets of Paul J. Rohrich, deceased, then in the possession of Kenneth Wells Parkinson (Parkinson), Trustee. The defendants were the Estate of Paul J. Rohrich, the American Security and Trust Company (the nominated co-executor of Rohrich's Last Will and Testament, dated December 3, 1975, which subsequently renounced its nomination), Thomas J. Egan (Egan) (the nominated co-executor), and William Arthur Weckesser (the primary beneficiary of numerous testamentary instruments executed during the last days of Rohrich's life).

On July 6, 1979, Egan filed suit against McNamara, Bowman, and ASI. The complaint sought to rescind or reform the Agreement, to require the return of Rohrich's stock, and to require that ASI pay the estate taxes still due and owing with respect to the Steele estate. The last request for relief was based upon the stock redemption resolution of January 1, 1971. The two actions were consolidated. After an eight day trial, the court denied all Egan's claims for relief. The court found the Agreement valid and ordered ·ASI, McNamara, Bowman, and Parkinson to deliver and pay over to Egan: (1) all of the money paid by ASI into a certain trust account held by Parkin-

son, as trustee, plus all interest earned thereon; and (2) the original promissory note from ASI, payable to the Estate of Paul J. Rohrich, in the sum of $968,974.16 dated January 30, 1976.[5]

Appellants cite several errors in the trial court's decision. Their overarching theory, however, is that McNamara breached his fiduciary duty to Rohrich and that the breach requires rescission of the Agreement. Appellants also contend that the Agreement, even if valid, does not supersede the corporate resolution permitting redemptions under Section 303 of the Internal Revenue Code. The trial court's failure so to rule, appellants insist, requires that the corporation be commanded to continue to redeem stock to pay taxes on the estates of *both* Steele and Rohrich. Appellants' third major contention is that the trial court should have construed the Agreement to require ASI to make installment payments to Rohrich's estate of the purchase price in excess of the one percent paid. Finally, they assign as error the trial court's approval of the inclusion of McNamara's and Bowman's shares in the valuation of ASI stock at the time of Rohrich's death.[6]

*FIDUCIARY DUTY*

Egan argues that, contrary to the trial court's finding, there was a fiduciary duty running from McNamara to Rohrich. In Egan's view, the duty is predicated either upon an attorney-client relationship between McNamara and Rohrich, or upon a trust relationship between the two as stockholders and participants in a close corporation.[7] Egan further contends that McNamara breached his duty to Rohrich with regard to the Agreement. Finally, Egan asserts, the trial court incorrectly assigned him the burden of proof as to the issue of the breach.

■ According to the District of Columbia Code of Professional Responsibility (Code), an attorney represents, and therefore owes a duty to, the entity that retains him.[8] When retained to represent a corporation, he represents the entity, not its individual shareholders, officers, or directors. In this case, ASI retained McNamara and it was to that entity that he owed any duty in connection with the Agreement. As general counsel to the corporation, his responsibility was to give the document embodying the Agreement sufficient consideration to see that it protected ASI's primary concerns, namely its continued existence and its safety from outside parties with a potential interest in taking over the company. The evidence shows that McNamara did give the Agreement personal attention and consideration in light of the needs of ASI. More than that, however, he enlisted the services of outside counsel who also reviewed the Agreement. Thus, under the

5. Motions of ASI, McNamara, and Bowman for a stay pending appeal by Egan of Judge McIntyre's order requiring delivery of the money and promissory note to him were denied below and in this court on October 7, 1981, and November 3, 1981, respectively.

On October 7, 1981, appellants noted their appeal to this court. Thereafter, appellees' August 16, 1982 motion for summary affirmance was denied on October 27, 1982.

6. Appellants also raise issues involving laches, the statute of limitations, and the denial of a motion for disqualification of counsel. None of these contentions has merit.

7. Close corporations are characterized by few stockholders who are generally all active in a business for which there is little or no market for their shares. 1 O'NEAL, CLOSE CORPORATIONS § 1.07 (2d ed. 1971).

8. Ethical Consideration 5–18 states:

A lawyer employed or retained by a corporation or similar entity owes his allegiance to the entity and not to a stockholder, director, officer, employee, representative, or other person connected with the entity. In advising the entity, a lawyer should keep paramount its interests and his professional judgment should not be influenced by the personal desires of any person or organization. Occasionally a lawyer for an entity is requested by a stockholder, director, officer, employee, representative, or other person connected with the entity to represent him in an individual capacity; in such case the lawyer may serve the individual only if the lawyer is convinced that differing interests are not present.

Code, McNamara fulfilled his duty to the only party to which it was owed, ASI. He owed no specific duty to Rohrich in connection with the Agreement, and, consequently, could not have been found to have breached one.

The result under the Code is wholly consistent with the relevant case law. In *Fielding v. Brebbia,* 156 U.S.App.D.C. 103, 479 F.2d 195 (1973), a corporation sued one of its directors, Fielding, for alleged mismanagement of a subsidiary. At the time the suit was filed, two attorneys were among the directors of the suing corporation. They had investigated the management of the subsidiary and had recommended the action against Fielding. Thereafter, Fielding sued these attorneys for breach of fiduciary duty, claiming that the performance by the attorneys of other free legal services for him, such as preparing tax returns, drafting wills, and setting up various corporations, created an attorney-client/fiduciary relationship with regard to the corporation's activities. The court rejected Fielding's characterization of the relationship vis-a-vis the corporation. It found that where none of the prior legal services involved disclosure of confidences affecting the suit for mismanagement, "[t]he corporation is the client ... [and] business confidences of business partners lack the protection of professional privilege." *Id.* at 106, 479 F.2d at 198.

As in *Fielding,* the corporation in this case was McNamara's client. Moreover, McNamara, like the attorneys in *Fielding,* did not receive separate compensation for the personal legal services rendered to Rohrich. Most significantly, however, these miscellaneous services had no bearing upon the Agreement. Thus, under *Fielding,* with which we agree, the trial court did not err when it rejected the suggestion of an attorney-client relationship.[9]

Assertions that in a close corporation, such as ASI was and is, the individuals involved *are* the corporation, do not disturb the conclusion that there was no fiduciary duty. McNamara represented the corporation, an entity legally distinct from its directors, officers, and shareholders. As ASI's counsel, his obligation was to ensure that the agreement was in the best interest of the company, regardless of its impact on individual shareholders. In a close corporation, where the perpetuation of the entity is of major concern, it is generally the case that the existing shareholders do not want outside parties to obtain control of the corporation through the purchase of shares upon the death or withdrawal of a present shareholder. A buy-sell agreement, such as the one entered into by the shareholders of ASI in June 1971, is one method of coping with this problem.[10]

9. *Helms v. Duckworth,* 101 U.S.App.D.C. 390, 249 F.2d 482 (1957), *aff'd after trial on remand,* 106 U.S.App.D.C. 8, 268 F.2d 584 (1959), which Egan urges this court to follow, is inapposite. The Agreement in this case is different in significant respects from the trust agreement in *Helms.* First, the Agreement provided for an objective valuation of the stock according to an IRS-approved formula, rather than a discretionary evaluation based simply on the acquiescence of both parties. Second, the Agreement preserved full majority control in Rohrich, who could make all important corporate decisions himself if he so chose. The trust agreement in *Helms* divested the majority stockholder of flexibility for the benefit of the minority stockholder. Third, the Agreement provided that the corporation, rather than the surviving stockholder, would purchase the deceased shareholder's stock. Thus, the Agreement was designed to preserve the benefits of the buy-sell

transaction *for the corporation* and not to favor McNamara and Bowman at Rohrich's expense.

10. Assuming that McNamara did have a fiduciary duty to Rohrich with regard to the Agreement, there was nevertheless no breach of that duty. Ethical Consideration 5–15 of the Code does state that an attorney may continue to represent multiple clients in a *non-litigation* context where their interests "vary only slightly" and the attorney has received their permission after full disclosure. And here, all the participating shareholders in the Agreement had the same interest as ASI: the perpetuation of the company without disruption should the shareholders die or wish to withdraw. However, McNamara had expressly refused to give Rohrich any legal advice about the Agreement, disclosing the fact that as a party he could not do so. McNamara also suggested that Rohrich consult outside counsel. Thus, it is clear that

In sum, we find no error in the trial court's conclusion that there was no fiduciary duty running from McNamara to Rohrich in the context of the buy-sell agreement. In the absence of such a duty there could be no breach.

■ Egan has also asserted that the trial court erroneously placed on him the burden of proof to show that the Agreement was unfair. He contends that because McNamara drew up an Agreement allegedly benefitting himself at Rohrich's expense and thereby created a fiduciary duty between himself and Rohrich, the law of this jurisdiction requires McNamara to sustain the burden of proof that the transaction was fair. Egan argues that the trial court misconstrued the law as stated in *Goodrum v. Clement,* 51 App.D.C. 184, 277 F. 586 (1922), when he found that Egan did not prove by a preponderance of the evidence that the transaction was unfair. In *Goodrum,* the court held that "where ... the evidence shows that as a result of assuming such a position [one antagonistic to his client] the attorney has gained an advantage, the burden is upon him to prove good faith, rather than on the client to prove the absence of it." *Id.* at 189, 277 F. at 591.

*Goodrum* is inapposite. The trial court found that no fiduciary relationship existed between Rohrich and McNamara and there is evidence to support that finding.

## SUPERSESSION OF THE STOCK REDEMPTION RESOLUTION

■ Egan argues that the trial court erred when it concluded that the execution of the June 4, 1971 Agreement superseded the earlier corporate resolution regarding stock redemptions. In his view, there was no supersession and ASI must continue to redeem stock to pay the taxes on both Rohrich's and Steele's estates.

On January 1, 1971, the Board of Directors of ASI resolved to empower the corporation to redeem the stock of any deceased stockholder. The corporate resolution was specifically designed to provide sufficient cash proceeds to Rohrich, under Section 303 of the Internal Revenue Code, to pay the Steele estate taxes for which Rohrich had transferee liability. Pursuant to this resolution, Rohrich periodically offered stock and redemptions occurred on November 18, 1971, June 1, 1973, June 24, 1974, and June 23, 1975.

The Agreement provides, in pertinent part, that:

Upon the death of any stockholder, the Corporation *shall* purchase ... *all of the common stock of the deceased stockholder* (emphasis added).

The language quoted plainly states that all of a deceased stockholder's common stock shall be sold by the estate to the corporation. It is mandatory and all inclusive. It does not provide any exceptions for common stock acquired by operation of law, such as that stock acquired by Rohrich at Steele's death. Thus, by its terms it supersedes the redemption resolution.

■ ·Furthermore, the law in the District of Columbia is that a contract containing a term inconsistent with a term of an earlier contract between the same parties regarding the same subject matter should be interpreted to rescind the inconsistent term in the earlier contract. *See Wardman v. Washington Loan and Trust Co.,* 67 App. D.C. 184, 186, 90 F.2d 429, 431 (1937). Here, the terms of the resolution and the Agreement address the disposition of stock owned by any deceased stockholder at the date of death. Those terms are, however, inconsistent. Therefore, the inconsistency of the two instruments, at least with respect to the disposition of a deceased stockholder's stock interest, should be deemed, in accordance with established principle of contract law, to rescind the original resolution and to substitute the subsequent Agreement as the controlling contractual instrument.

The trial court did not err, then, when it found that the Agreement superseded the earlier corporate resolution.

McNamara declined to accept representation of Rohrich in this instance.

## INSTALLMENT PAYMENTS

■ Egan contends that if the Agreement is valid, the trial court should have construed it to require installment payments of principal, as well as interest, on the amount in excess of the one percent paid for the stock purchased by ASI after Rohrich's death. In connection with his assertion Egan makes three arguments. First, he states, "Egan moved for leave to plead that installment payments were required by the [A]greement and the court denied the motion." The Record shows that this misstates the court's ruling. In fact, the court expressly *granted* leave to amend.

■ Second, Egan states:

It is normal and customary for installment payments to be made in purchases of businesses. The expert Myer so stated, as did Miss Bowman regarding Answering's purchase of smaller companies over the years.

Once again, the Record indicates otherwise: Myer was, at best, equivocal about what the custom is and never answered affirmatively that installment payments were the normal and customary method of payments.

■ Third, Egan contends that as the drafter of the Agreement, McNamara is subject to the rule that any ambiguities must be resolved against him. As general counsel, McNamara could have inserted anti-installment language had he so chosen. The failure to do so, Egan contends, requires the conclusion that installments were intended under *North American Graphite Corp. v. Allan,* 87 U.S.App.D.C. 154, 157, 184 F.2d 387, 390 (1950). This argument is meritless for two reasons. McNamara was not the drafter of the Agreement although he did review the document to assess its impact on ASI. Moreover, *North American Graphite* is incorrectly cited. That case is authority only for the proposition that ambiguities in a contract must be resolved against the drafter. The case says nothing about drawing any inference such as the one Egan would have this court draw.

■ Egan does not make any affirmative argument why the Agreement should be construed in any particular way. He points to nothing either in the Agreement itself or in the Record to suggest that any of the parties ever intended that the Agreement be construed to require installment payments of the principal. The Agreement was construed by the trial court, as it correctly could be, to require only installment payments of interest, with the principal to be paid off in 15 years. We see no basis for disturbing this ruling by the trial court.

## VALUATION OF SHARES

Egan contends that the minutes of the Board of Directors' meetings, at which Rohrich's redemptions were reported, and the corporation's financial statements, indicate that McNamara's and Bowman's shares were not of the same character, quality, and status as Rohrich's. It is his position that the shares were not treated as fully paid, non-assessable, and issued in 1974, and that they should not have been included to compute the value of Rohrich's stock. The failure of the court to recognize this, it is alleged, "resulted in a reduction of approximately $100,000 to $150,000 in the principal amount of the Promissory Note."

Rohrich caused the corporation, on June 4, 1971, to sell McNamara and Bowman 10 shares each of newly issued stock and to assent to the Agreement. The Agreement referred to Rohrich, McNamara, and Bowman as the owners of stock. Thereafter, in November 1971, McNamara and Bowman executed promissory notes for the total price of the stock, and, at the same time, each made a payment in excess of the stock's par value toward those notes. The two continued to make annual payments, and by December 31, 1975, the notes were fully paid.

■ Delaware law, as the law of the corporation's domicile, controls for purposes of determining who owns ASI stock.[11] At the time that the McNamara/Bowman

11. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 303 (1971).

shares were issued and the Agreement was entered into, DEL.CODE ANN. tit. 8, § 152 (1974), provided that stock could be paid for "wholly or partly, by cash, . . . [or] by personal property" and that once issued for such consideration, it was fully paid. This code provision was amended, effective July 1, 1974. The amended provision defines "fully paid and nonassessable stock" as that stock: (1) for which the whole consideration has been paid at once in the form of cash, services, personal property, etc., or any combination thereof; or (2) for which the corporation has received contribution in those categories for the amount designated as "capital" (par or stated value) together with a binding obligation for the remainder. In the commentary regarding amended § 152, the General Corporation Law committee of Delaware made it clear that the new provision reflected the Delaware courts' interpretation of original section 152.[12] McNamara and Bowman qualify under either version of § 152 as owners of fully paid and nonassessable stock. They each paid cash for more than the amount designated as "capital" (par value) and executed a promissory note for the "excess."

Assuming, however, that the 1974 amendment did not clarify existing law, some Delaware cases have indicated that courts will look at the equities to determine in what instances shareholders in McNamara's and Bowman's position will be treated as the owners of their shares. *See, e.g., Highlights for Children, Inc. v. Crown,* 43 Del.Ch. 323, 227 A.2d 118 (1966); *Maclary v. Pleasant Hills, Inc.,* 35 Del.Ch. 39, 109 A.2d 830 (1954). In this case, Rohrich at all times acknowledged that McNamara and Bowman were stockholders. The Federal Income Tax returns for ASI show the two as having an equity interest. Furthermore, Rohrich's acquiescence and participation in the issuance of stock, even if arguably for inadequate consideration, bars his right to complain against its issuance. *Goodman v. Futrovsky,* 42 Del.Ch. 468, 213 A.2d 899

(1965), *cert. denied,* 383 U.S. 946, 86 S.Ct. 1197, 16 L.Ed.2d 209, *reh. denied,* 384 U.S. 934, 86 S.Ct. 1443, 16 L.Ed.2d 535 (1966).

Finally, granting Egan's request for rescission of the Agreement would vest all control of the corporation in the estate. This would entirely frustrate Rohrich's intent to perpetuate ownership and management of the corporation in its employees.

Finding no error in the trial court's disposition, we affirm.

*So ordered.*

---

**12.** "Commentary on Legislative Proposals for the 127th General Assembly, Second Session, 1974," by the General Corporation Law committee of the Delaware State Bar Association.