Kevin AYALA, Appellant,

v.

Evie L. WASHINGTON, Appellee.

No. 92–CV–1553.

District of Columbia Court of Appeals.

Argued Feb. 28, 1995.

Decided July 25, 1996.

Paul H. Zukerberg, Washington, DC, for appellant.

Robert J. Jones, Washington, DC, for appellee.

Before TERRY and RUIZ, Associate Judges, and MACK, Senior Judge.

RUIZ, Associate Judge.

This case requires us to decide the meaning of the First Amendment's injunction against laws "abridging the freedom of speech, or of the press" in the context of an action for defamation. A jury found that appellant Kevin Ayala, an airline pilot, had shown by a preponderance of the evidence that his former lover, appellee Evie Washington, falsely told Ayala's employer and the Federal Aviation Administration that he had used marijuana during his off-duty hours. The jury also found that Ayala had shown by clear and convincing evidence that Washington either knew her accusation was false or acted with reckless disregard for its truth or falsity. The jury awarded Ayala nominal compensatory and punitive damages. Nevertheless, the trial court entered judgment for Washington, finding Ayala's showing insufficient under the First Amendment to sustain any judgment against Washington because the accusation made against him was on a "matter of public concern." Although we agree that Washington's communication to the FAA was on a "matter of public concern," we hold that Ayala's showing met the standard required by the First Amendment

for the award of compensatory and punitive damages. Thus, the trial court erred in setting aside the award of nominal compensatory damages and in refusing to permit Ayala to present evidence relevant to fixing the amount of punitive damages. Accordingly, we reverse and remand for a new trial on the question of punitive damages.

## I.

When the parties met, Ayala was a commercial airline pilot and Washington worked in an administrative position for the Central Intelligence Agency. As a result of their mutual interest in aviation, they became partners in the ownership of a small plane and eventually also romantically involved. Neither relationship, however, provided lasting rewards to the parties. Sometime after their personal relationship ended, but during the troubled course of their proprietary relationship, Washington wrote to the FAA and to Ayala's employer alleging that Ayala had engaged in several acts of misconduct, including the use of marijuana while off duty.

In a letter dated April 24, 1990, addressed to Ayala's employer, Washington asserted that she "knew [Ayala] used marijuana." She also wrote,

I would hate to see all USAIR pilots or any commercial pilots get a bad reputation because of one person. I know most of the general public still suspect that drugs were the real reason for USAIR carrier crashing off the end of the runway in New York. I'm trying to keep my friends and family from accidentally creating more bad publicity and suspicion of your pilots by talking to the wrong people about [Ayala's] behavior.

Another letter, dated May 16, 1990, was sent to the FAA. In it, Washington acknowledged receiving a letter from the FAA, which apparently discounted accusations she had made earlier against Ayala. She wrote, in part,

I respect and take FAA [regulations] serious[ly]. I thought that all FAA officials were serious about the FAA [regulations], and I did not realize, until now, that FAA officials play favoritism with certain indi-

viduals. I'm sorry that I thought that anyone who knowingly and deliberately violates the FAA [regulations], uses marijuana, and ha[s] had other FAA violations, would be the bad guy. But you all are making him into a saint, but I forgot he's an airline pilot and a man. I'm just a nonessential woman and lowly government employee. So [Ayala] is congratulated for violations and probably is being helped to cover up his violations, and I'm condem[n]ed and called crazy.

A third letter, dated October 9, 1990, was addressed to the chairman of the board of Ayala's employer. In it, Washington reiterated her earlier allegations of drug use and other violations of FAA regulations. Near the close of the letter, Washington said,

I know it is too much to ask for you to get [Ayala] to become responsible and mature enough to correct the grave injustice and stress that he has caused me. But I plead and pray that you will take the necessary action to save the lives of unsuspecting passengers that board[ ] the [aircraft] that [Ayala] is in charge of.

Ayala was never disciplined as a result of Washington's accusations, which the FAA and his employer determined to be unfounded.

Ayala commenced this defamation action requesting compensatory and punitive damages; Washington counterclaimed for abuse of process. In its pretrial order, the court directed Ayala not to mention his claim for punitive damages during his opening statement and forbade him from introducing evidence of Washington's net worth and his attorney fees unless and until the jury found in his favor regarding liability.

At trial, a dispute arose regarding Ayala's burden of proof. Debate focused on whether Washington's statements were on a "matter of public concern." The trial judge thought that they were, and that a higher standard of clear and convincing evidence, rather than a preponderance of evidence, was required. Because the trial judge was uncertain, however, he solicited jury findings under both standards and devised a special interrogatory form that he believed would create a complete appellate record. Neither party object-

ed to the form. As completed by the jury, the form reads as follows:

1. Do you, the jury, find that Kevin Ayala, has established his cause of action for defamation by clear and convincing evidence?

 Yes _____ No __X___

2. Do you, the jury, find that Kevin Ayala, has established his cause of action for defamation by a preponderance of the evidence?

 Yes __X___ No _____

3. If you answered either or both of the questions above, "Yes" proceed to the next question. What sum of money do you award to the Plaintiff, Kevin Ayala, as compensatory damages in this case?

_$1.00_

4. If you answered Questions 1 and/or 2 "Yes" in addition to compensatory damages, including nominal compensatory damages, you may also award punitive damages, if you find punitive damages to be justified. What sum of money do you award to the Plaintiff, Kevin Ayala, as punitive damages, if any, in this case?

_$1.00_

5. On Evie L. Washington's Counterclaim for Abuse of Process, how do you the jury find?

 For Evie L. Washington, Counterclaim Plaintiff ____

 For Kevin L. Ayala, Counterclaim Defendant __X__

6. If you find for Evie L. Washington, Counterclaim Plaintiff, what sum of money do you find will reasonably compensate her for her damages?

$_____

In its instructions, the trial court defined the term, "cause of action for defamation," referred to in the first two interrogatories, as proof of a false, defamatory statement and

publication of the statement by the defendant with actual malice.[1]

With respect to punitive damages, the trial court instructed the jury that it could only award such damages upon a finding

> that [Washington] acted with knowledge of the falsity of the communication or with [r]eckless disregard as to whether the statements were true or false. The party seeking punitive damages must establish the grounds for punitive damages by clear and convincing evidence.

After judgment was entered for Ayala on the jury's verdict, Washington moved for judgment as a matter of law. Ayala sought a trial on his claim for punitive damages, including an opportunity to present evidence concerning his expenditures on attorney fees and costs. The trial court granted Washington's motion, ruling that because the defamatory material involved a matter of public concern, Ayala was required to prove all elements of his case by clear and convincing evidence. The trial court denied Ayala's motion on the same ground and on the alternative ground that "in view of the nominal compensatory damages award, there was little or no evidence to justify a punitive damages award, even as to the $1.00 award."

## II.

We review the trial court's action by determining, first, what the jury found and, second, whether such findings satisfy the legal requirements for award of compensatory and punitive damages in a defamation action. Turning, first, to what the jury found, we look at what it was asked to decide. The first two interrogatories concerning establishment of Ayala's "cause of action for defamation" were compound—the jury had to find three facts: falsity, publication, and constitutional malice. The first interrogatory asked whether these facts had been proven by clear and convincing evidence, the second interrogatory inquired whether they had been proven by a preponderance of the evidence. If the jury failed to find any one fact to have been established with the requisite certainty, under the instructions the jury was required to give a negative answer to that interrogatory. An affirmative answer would mean that the jury found all three facts to have been established with the requisite certainty. Interrogatory number four asked only one question, whether punitive damages were justified. The jury had been instructed that, for punitive damages to be justified, the jury had to find that Ayala had established constitutional malice by clear and convincing evidence.

■ In determining what the jury found, we will, if possible, reconcile the jury's responses, consistent with the instructions given. *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 765–66 (3d Cir.1990) (holding that court is constitutionally required to accept verdict if there is *any* view of case under which responses may be reconciled); *see also* 5A James W. Moore Et Al., Moore's Federal Practice ¶ 49.04 at 49–62 (2d ed. 1996) (noting that failure to object to verdict on grounds of inconsistency operates as waiver of objection). Thus, reconciling the jury's findings, we know that because the jury awarded punitive damages, the jury found constitutional malice by clear and convincing

---

1. The trial court instructed the jury with respect to each element of defamation:

... A defamatory statement is one which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of or from association or dealing with that person, words charging another with the commission of a criminal act are actionable in and of themselves unless ... the statement at the time it was made was qualifiedly privileged. And I would explain to you later what qualified privilege means.

... Publication of a statement means that the statement is communicated to and understood by a person other than the plaintiff;

... [A]ctual malice ... is defined as the publication by the defendant with knowledge that they were false; that is, that the statements were false or the statements were in [r]eckless disregard of whether they were false or not. [R]eckless disregard is shown if the defendant actually entertained serious doubts about the truth of the statements when she published them. In determining whether the statements defamed the plaintiff, Kevin Ayala, you are to consider how the statements appeared to have been meant by the defendant, Evie L. Washington, and how it was understood by those to whom they were communicat[ed].

evidence. The jury's negative response to the first interrogatory must mean, therefore, that it did not find either falsity or publication—or both—to have been shown by clear and convincing evidence. Its affirmative response to the second interrogatory, on the other hand, means that the jury found that falsity and publication had been established by at least a preponderance of the evidence. Having determined what the jury found, we turn to a discussion of the applicable legal standards.

### III.

■ The First Amendment restricts the power of government to stifle speech by limiting the channels of communication available to speakers or by controlling the content of communication. *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382, 112 S.Ct. 2538, 2542–43, 120 L.Ed.2d 305 (1992) (content); *Regan v. Time, Inc.,* 468 U.S. 641, 648, 104 S.Ct. 3262, 3266–67, 82 L.Ed.2d 487 (1984) (content and channels); *Members of the City Council of L.A. v. Taxpayers for Vincent,* 466 U.S. 789, 804, 812, 104 S.Ct. 2118, 2132–33, 80 L.Ed.2d 772 (1984) (same). The restrictions on governmental power in those areas depend, ironically, on the content of the speech. *Consolidated Edison Co. v. Public Serv. Comm'n,* 447 U.S. 530, 538 n. 5, 100 S.Ct. 2326, 2333 n. 5, 65 L.Ed.2d 319 (1980) (citing cases). Some communications are not entitled to any constitutional protection as speech. *See Dun & Bradstreet, Inc. v. Greenmoss Builders,* 472 U.S. 749, 758 n. 5, 105 S.Ct. 2939, 2944–45 n. 5, 86 L.Ed.2d 593 (1985) (noting that obscene speech and "fighting words" have no First Amendment protection). Included in that unprotected category are falsehoods and obscenity. *See, e.g., Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980) ("For commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading."); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974) ("[T]here is no constitutional value in false statements of fact."); *Roth v. United States,* 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498 (1957) (obscene speech). The First Amendment also imposes lesser restrictions on government regulation of certain categories of speech than others. *Dun & Bradstreet, supra,* 472 U.S. at 758 n. 5, 105 S.Ct. at 2944–45 n. 5. For example, nonmisleading commercial speech may be restricted upon a lesser showing of governmental interest than noncommercial speech. *Compare, e.g., Central Hudson, supra,* 447 U.S. at 566, 100 S.Ct. at 2351 (requiring that restrictions on commercial speech directly advance substantial government interest) *with Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 657–58, 110 S.Ct. 1391, 1396–97, 108 L.Ed.2d 652 (1990) (holding that statute burdening political speech must be justified by compelling state interest) *and Sable Communications, Inc. v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 2836–37, 106 L.Ed.2d 93 (1989) (holding that regulation of indecent telephone message services had to be narrowly tailored to serve compelling government interest). *But see 44 Liquormart, Inc. v. Rhode Island,* — U.S. —, — – —, 116 S.Ct. 1495, 1508–09, 134 L.Ed.2d 711 (1996) (citing *Central Hudson,* but emphasizing that ban on commercial speech advertising liquor prices should be reviewed with "special care" and be upheld only if it is shown to "*significantly* reduce alcohol consumption").

Although falsehoods are not entitled to constitutional protection against government regulation, the Supreme Court has recognized that allowing government unfettered power to damnify a speaker on account of her false statements, even at the instance of a private litigant suing for defamation, could result in would-be speakers being inhibited from engaging in constitutionally-valuable speech. *New York Times Co. v. Sullivan,* 376 U.S. 254, 271–72, 279, 84 S.Ct. 710, 721–22, 725–26, 11 L.Ed.2d 686 (1964). Therefore, the Court has held that before a speaker may be penalized for false statements, the party seeking to recover damages for defamation must show the existence of certain facts to a requisite degree of certainty. *Id.*

■ There are four factors to be determined in the universe of First Amendment defamation law: the kind of speech, the facts that must be proven, the certainty of proof required, and the type of damages. *See Philadelphia Newspapers v. Hepps,* 475 U.S. 767, 771–79, 106 S.Ct. 1558, 1560–65, 89

L.Ed.2d 783 (1986).[2] A determination whether a particular speech is the kind that merits constitutional protection depends upon whether the subject of the speech is a public official or figure, or, if a private person, whether the speech is on a matter of public or private concern. *Id.* at 773–75, 106 S.Ct. at 1562–63 The facts that may need to be proven are falsity and some degree of fault. The permissible degrees of proof range from a presumption in favor of the claimant to a showing by clear and convincing evidence. *Id.* The type of damages allowed, whether to compensate for proven injury or presumed or punitive in nature, depends on combinations of the preceding three factors. In a series of cases the Supreme Court has set out some of the requirements imposed by the First Amendment before a speaker can be held legally responsible for the speech. In general, the closer speech comes to the core of the First Amendment, the higher the burden of proof required before the government may hold the speaker legally responsible for the consequences of the speech.[3]

In this case, the jury found that Ayala had shown constitutional malice by clear and convincing evidence, but had otherwise established the other two elements of his claim, falsity and publication, only by a preponderance of the evidence. Applying the legal

2. The Supreme Court has not ruled on whether a fifth factor exists: whether the defendant is properly characterized as a member of the media. *Philadelphia Newspapers v. Hepps,* 475 U.S. 767, 779 n. 4, 106 S.Ct. 1558, 1565 n. 4, 89 L.Ed.2d 783 (1986). This court has concluded, however, that the First Amendment recognizes no such distinction. *Moss v. Stockard,* 580 A.2d 1011, 1022–23 n. 23 (D.C.1990); *see also Dun & Bradstreet, Inc. v. Greenmoss Builders,* 472 U.S. 749, 783–84, 105 S.Ct. 2939, 2957–58, 86 L.Ed.2d 593 (Brennan, J., dissenting) (noting that six Members of the Court agreed that rights of the media and non media defendants are the same).

3. Thus far, the Supreme Court has established the following constitutional requirements, depending on the kind of speech and the type of damages requested.

Damages

| | compensatory | | presumed/punitive | |
|---|---|---|---|---|
| | fact | proof | fact | proof |
| public official or public figure | falsity constitutional malice | ? c/c [a] | falsity constitutional malice | ? c/c [a] |
| private person/ public concern | falsity fault | p/p [b] p/p [c] | falsity constitutional malice | ? c/c [c] |
| private person/ private concern | falsity fault | ? ? | falsity fault [d] | ? ? |

(Key: "c/c" means clear and convincing evidence; "p/p" means preponderance of the evidence; a question mark indicates that the Supreme Court has not yet decided the issue.)

[a] *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964) (requiring proof of constitutional malice by clear and convincing evidence, but silent as to burden regarding falsity).

[b] *Philadelphia Newspapers v. Hepps,* 475 U.S. 767, 776, 106 S.Ct. 1558, 1563–64, 89 L.Ed.2d 783 (1986) (requiring that private figure plaintiff bear burden of showing falsity of statement on matter of public concern before recovering compensatory damages.)

[c] *Gertz v. Robert Welsh, Inc.,* 418 U.S. 323, 347–50, 94 S.Ct. 2997, 3010–12, 41 L.Ed.2d 789 (1974) (permitting states to award damages for actual injury upon proof of fault where plaintiff is private figure, but requiring constitutional malice be shown by clear and convincing evidence as prerequisite to award of presumed or punitive damages.

[d] *Dun & Bradstreet, Inc. v. Greenmoss Builders,* 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (no majority opinion) (holding that presumed and punitive damages could be awarded to private figure plaintiff on the basis of a negligently-made, false, defamatory statement on a matter of only private concern, without a showing of constitutional malice by clear and convincing evidence).

requirements that the Court has heretofore established[4] to the jury's findings in this case, the trial court's grant of judgment as a matter of law in favor of Washington on the issue of compensatory damages can be sustained only if Ayala is a public figure *and* falsity must be proved by clear and convincing evidence. If Ayala is not a public figure, we would have to reverse the judgment on compensatory damages; we could still sustain judgment as a matter of law denying punitive damages were we to hold that Washington's statements were on a matter of public concern *and* that falsity must be proved by clear and convincing evidence. Thus, we address those three potentially dispositive issues.

### A.

### Is Ayala a "public figure"?

■ Whether a plaintiff is a public official or public figure is a question of law for the court to determine. *Moss v. Stockard,* 580 A.2d 1011, 1029 (D.C.1990). Our independent examination of the record in light of Supreme Court precedent satisfies us that Ayala is not a public figure. In *Gertz, supra,* the Court stated that "[a]bsent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life." 418 U.S. at 352, 94 S.Ct. at 3013. The focus is on "the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Id.* In *Gertz,* the plaintiff was a private lawyer who played a peripheral role in a controversy concerning the criminal prosecution of a police officer. *Id.* The Court ruled that because Gertz did not "thrust himself into the vortex of th[e] public issue, nor did he engage the public's attention in an attempt to influence its outcome," Gertz could not be deemed a public figure. *Id.*

Ayala has not thrust himself into the vortex of any controversy concerning drug use by pilots, nor has he in any sense engaged

the attention of the public. The Court's holding in *Hutchinson v. Proxmire,* 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979), confirms that Ayala is not a public figure. In *Hutchinson,* the plaintiff was a scientist who received federal grants to conduct research to measure stress in animals by the tension in their jaws. Senator Proxmire awarded a "Golden Fleece" award mocking Hutchinson's work. Suing for defamation, Hutchinson contended that Proxmire's newsletter and television statements regarding the award mischaracterized his research. The Court held that Hutchinson was not a public figure, *id.* at 135–36, 99 S.Ct. at 2688–89, stating, "Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Id.* at 135, 99 S.Ct. at 2688. Nor was a general concern about public expenditures enough to make Hutchinson a public figure. *Id.* Because Hutchinson at no time thrust himself into view or assumed any role of public prominence, he was not a public figure. *Id.*

■ By virtue of his position, like Hutchinson, Ayala potentially affected a matter of public concern; but also like Hutchinson, Ayala did nothing to assume a public role regarding that concern. Consequently, Ayala cannot be considered a public figure.[5] To the extent that the trial court's grant of judgment as a matter of law vacated the jury's award of compensatory damages, it must be reversed, and the jury's award of $1.00 in compensatory damages, reinstated.

### B.

### Were the statements "a matter of public concern"?

■ Whether a statement addresses a matter of public concern is a question of law. *See Dun & Bradstreet, Inc., supra,* 472 U.S.

---

4. *See supra* note 3.

5. In *Moss v. Stockard,* 580 A.2d 1011 (D.C.1990), we used a three-part test set out by the United States Court of Appeals for the District of Columbia Circuit in *Waldbaum v. Fairchild Publications,* 201 U.S. App.D.C. 301, 627 F.2d 1287, *cert. denied,* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980), as a "road map through the terrain of Supreme Court precedent on [the] point [of who is a public figure]." 580 A.2d at 1030. We noted in *Moss* that the touchstone was whether the plaintiff had assumed a role in society that invites attention and comment. *Id.* Because it is clear that the present case is controlled by *Hutchinson* and that Ayala did not assume any role of prominence in society, we have no need of the "road map" supplied by *Waldbaum.*

at 761–62, 105 S.Ct. at 2946–47 (plurality opinion); *see also Connick v. Myers,* 461 U.S. 138, 148 n. 7, 103 S.Ct. 1684, 1690 n. 7, 75 L.Ed.2d 708 (1983) ("The inquiry into the protected status of speech is one of law, not fact."). In *Dun & Bradstreet,* the plurality said that whether a statement addressed a matter of public concern had to be determined by its " 'content, form and context.' " 472 U.S. at 761, 105 S.Ct. at 2946 (quoting *Connick, supra,* 461 U.S. at 147–48, 103 S.Ct. at 1690).

We distinguish between matters of public concern and those of private concern in light of the reason that the Supreme Court has given in support of the distinction. The plurality in *Dun & Bradstreet* explained the reason for the distinction as resting on the Court's "long recogni[tion] that not all speech is of equal First Amendment importance." 472 U.S. at 758, 105 S.Ct. at 2944. The plurality stated that its

> special concern for speech on public issues is no mystery: The First Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people. Speech concerning public affairs is more than self-expression; it is the essence of self-government. Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection.

In contrast, speech on matters of purely private concern is of less First Amendment concern. As a number of state courts … have recognized, the role of the Constitution in regulating state libel law is far more limited when the concerns that activated *New York Times* and *Gertz* are absent. In such a case, there is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas concerning self-government; and there is no threat of liability causing a reaction of self-censorship by the press.

*Id.* at 759–60, 105 S.Ct. at 2945–46 (footnotes, citations, internal quotations and alterations omitted).

In light of the lessened constitutional interest in purely private speech, the plurality said that a different balance was appropriate between the risk that some speech will be inhibited and the opportunity of states to fashion rules to protect reputations and compensate damage to them. *Id.* at 760–61 & n. 7, 105 S.Ct. at 2945–46 & n. 7. The two concurrences in *Dun & Bradstreet* each agreed that less protection for speech without "public importance" was appropriate. *Id.* at 764, 105 S.Ct. at 2948 (Burger, C.J., concurring); *id.* at 774, 105 S.Ct. at 2953 (White, J., concurring).

■ The *Dun & Bradstreet* contrast of speech about "political and social changes," "public affairs," "self-government," and "public issues" with speech of "purely private concern" shows that the focus of the phrase "matters of public concern" is not on speech that might be of popular interest because it captures the attention of the public based on its sensational or human interest aspects, but is instead on speech of *constitutional* interest because it relates to the ordering of government and society at large. This approach is consistent with *Gertz, supra,* where the Court expressly rejected any test that turns on a judicial determination of whether the content of the defamatory statement attracted public interest. 418 U.S. at 346, 94 S.Ct. at 3010 (rejecting plurality approach in *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 43, 91 S.Ct. 1811, 1819–20, 29 L.Ed.2d 296 (1971), which would have had protection turn on a determination that the statement was a matter of "public or general interest"); *see also Rosenbloom, supra,* 403 U.S. at 63–64, 91 S.Ct. at 1829–30 (Harlan, J., dissenting) (arguing that majority went too far in applying *New York Times* to "private libels that arise out of events found to be of 'public or general concern.' "); *id.* at 78–79, 91 S.Ct. at 1836–37 (Marshall, J., dissenting (same)); *see also Harley–Davidson Motorsports v. Markley,* 279 Or. 361, 568 P.2d 1359, 1362 (1977) (recognizing *Gertz* 's rejection of plurality approach in *Rosenbloom* ). In rejecting the *Rosenbloom* plurality approach, the *Gertz*

**1066**

Court reasoned that, on the one hand, a private individual would have no recourse if the publication concerned a matter that happened to be popular or of general interest; thus, the *Rosenbloom* plurality test was under-protective of the private figure. *Id.* On the other hand, the uncertainty of determining what is of popular interest would insufficiently protect the publisher, who would be left to the mercy of the common law if it misjudged the issue. *Id.* Thus, *Gertz*, like *Dun & Bradstreet*, rejects any distinction in constitutional protection based on what may happen to capture public attention and what does not.[6]

The foregoing distinction comports with the Court's holdings in the three cases in which it decided whether speech concerning a private figure was of public or private concern. In *Gertz, supra*, the speech of pub-

lic concern criticized the criminal prosecution of a police officer. 418 U.S. at 326–27, 94 S.Ct. at 3000–01. In *Hepps, supra*, the speech of public concern alleged that a businessman had corruptly influenced public officials to give him favorable regulatory treatment. 475 U.S. at 769, 106 S.Ct. at 1559–60. In *Dun & Bradstreet, supra*, on the other hand, the speech of private concern related to the financial status of a small company, disseminated to the company's creditors for the purpose of informing their decisions in business dealings. 472 U.S. at 751–52, 105 S.Ct. at 2941–42. The determining factor in these three cases is whether or not the speech addressed the conduct of government. In the two cases where it did, *Gertz* and *Hepps*, the Court determined that the speech was a "matter of public concern."

Three state-court decisions cited favorably by the *Dun & Bradstreet* plurality also illustrate the point. In *Denny v. Mertz*, 106

6. For this reason, we think that the approach exemplified in some cases, which seeks to identify those issues in which the public has an interest—as opposed to those which are of public importance—is inconsistent with both the Supreme Court's rulings and the logic underlying the imposition of constitutional restrictions on the substance of legislation. *See, e.g., Unelko Corp. v. Rooney*, 912 F.2d 1049, 1056 (9th Cir. 1990) (holding that television network commentator's derogatory statement concerning plaintiff's product was matter of public concern because it "was of general interest and was made available to the general public [and] protection of statements about product effectiveness will ensure that debate on public issues will be uninhibited, robust and wide-open" (internal quotations, citations, and alterations omitted)), *cert. denied*, 499 U.S. 961, 111 S.Ct. 1586, 113 L.Ed.2d 650 (1991); *Blue Ridge Bank v. Veribanc, Inc.*, 866 F.2d 681, 686 (4th Cir.1989) (holding that where defendant's statements analyzed financial health of banks, including the plaintiff, "[b]ecause of the obvious importance of banks to the financial health of our communities and the historic government interest in the operations and solvency of these institutions, we have no difficulty concluding that Veribanc's statements relate to a matter of public concern."); *Silvester v. American Broadcasting Cos.*, 839 F.2d 1491, 1493 (11th Cir.1988) ("The defamatory speech [which concerned an alleged conspiracy among powerful interest groups in the American jai alai industry] clearly addresses matters with which the public has a legitimate concern. The public is legitimately interested in all matters of corruption, particularly when the corruption involves gambling in a highly-regulated industry and the effects of the corruption could cost taxpayers and the many members of the general public who patronize the industry millions of

dollars."); *Carney v. Santa Cruz Women Against Rape*, 221 Cal.App.3d 1009, 271 Cal.Rptr. 30, 37 (1990) (holding that newsletter's false report that plaintiff had sexually assaulted woman addressed matter of public concern because "the topic here is not solely in the individual interest of the speaker and its specific business audience. To the contrary, sexual harassment and violence against women is of pressing public concern."); *Rabren v. Straigis*, 498 So.2d 1362, 1363 (Fla. Dist.Ct.App.1986) ("We conclude that the statements allegedly made by defendant in this case involved a matter of public concern. In this part of the country it is well known, and commonly a subject of media coverage, that the performance of harbor pilots in guiding seagoing vessels is a matter of concern not only for the safety of the vessels but for the public in general."); *Dougherty v. Boyertown Times*, 377 Pa.Super. 462, 547 A.2d 778, 784 (1988) (holding that letter to newspaper falsely accusing chiropractor of overcharging addressed matter of public concern because by adopting law regulating chiropractic practice, "the legislature has implicitly stated that the quality of chiropractic services rendered in this Commonwealth is a matter of public concern"); *see also Vern Sims Ford, Inc. v. Hagel*, 42 Wash. App. 675, 713 P.2d 736, 741 (1986) (holding that flyers falsely accusing a car dealer of dishonest practices constituted "private business dispute," not matter of public concern); *Sartain v. White*, 588 So.2d 204, 213 (Miss.1991) ("[A]ccusations [concerning murder, robbery and terrorism] generally are a matter of public concern...."); *Staheli v. Smith*, 548 So.2d 1299, 1304–05 (Miss. 1989) (holding that statements made in course of decision process concerning grant of academic tenure to particular individual not of public concern because it "was essentially an employment dispute" and "occurred in a very confidential setting and had a very limited audience").

Wis.2d 636, 318 N.W.2d 141, *cert. denied,* 459 U.S. 883, 103 S.Ct. 179, 74 L.Ed.2d 147 (1982), the court held that a statement made by the defendant to a reporter in an interview about a stockholder dispute concerning a private company was not entitled to special protection under *Gertz. Id.* 318 N.W.2d at 143, 153. The court quoted from Justice Goldberg's concurrence in *New York Times:*

> "Purely private defamation has little to do with the political ends of a self-governing society. The imposition of liability for private defamation does not abridge freedom of public speech or any other freedom protected by the First Amendment."

*Id.* at 153 (quoting *New York Times, supra,* 376 U.S. at 301–02, 84 S.Ct. at 737 (Goldberg, J., concurring)).

In *Harley–Davidson Motorsports, supra,* the Oregon Supreme Court held that *Gertz* protections did not apply in an action for defamation based on a letter written by the plaintiff's competitor to their common franchisor that reported that the plaintiff had poorly served a customer. 568 P.2d at 1361, 1364. The court reasoned,

> In the present case the interest in democratic dialogue is non-existent. The defamatory matter does not contribute to the free exchange of ideas in decision making for a self-governing society. When this interest supporting First Amendment speech is removed, the only interests left, when weighed against the states' protection of a private individual's reputation, call for a conclusion that the free speech guarantee does not require interference with the states' interest in providing redress for defamation. The Supreme Court of the United States has never indicated in this context that constitutional curtailment of state actions was necessary to protect free speech interests.

*Id.* at 1364.

Finally, in *Rowe v. Metz,* 195 Colo. 424, 579 P.2d 83 (1978), the court held that where "the defamatory remarks relate[d] to the conduct of an individual's business affairs," they were "essentially private in nature" and the protection afforded by *Gertz* against presumed damages should not apply. *Id.* 579 P.2d at 84. Like the court in *Denny,* the court in *Rowe* quoted Justice Goldberg's concurrence in *New York Times* and held that "the balance should be struck in favor of the private plaintiff where his reputation has been injured by a non-media defendant in a purely private context." *Id.* 579 P.2d at 84–85.

Although the foregoing cases speak of "striking a balance" between the risk that truthful speech on a particular topic will be inhibited and the risk that injury to reputation will go uncompensated and undeterred, our threshold decision is in essence a decision about *who* shall strike that balance. If we decide that the First Amendment protects the defamatory statements in this case, then the decision will have been made—the balance struck—at the most fundamental level of national legislation through the Constitution. If we decide, however, that First Amendment protection does not apply to the defamation claim in this case, then we permit the ordinary law-making organs of state and national government to strike the balances they think are best suited to the times and places over which they exercise jurisdiction. Thus, we pause to consider what factors should affect our decision about who should decide.

■ Where speech concerns the conduct of government or important issues of self-governance, there is a grave danger that those who make and apply the rules at a given time—the governing majority of the moment—will undervalue criticism of the status quo in relation to the reputations of those who represent it. Thus, it is important that the balance in connection with such issues be struck in favor of protection of speech—and against undue government regulation of speech—through the more permanent device of the Constitution. Therefore, such matters are properly treated as of "public concern," and speakers are protected by the First Amendment from the inhibition that they inadvertently may run afoul of defamation laws.

■ Where the matter is one that affects the interests of all, on the other hand, there is less danger that the value of defamatory speech will be inadequately weighed by the

government in the balance against reputation. Applied to the airline safety concern alleged in this case, where the issue is the safety of all and the reputations of a few, it is more likely that the risk of inhibited speech will be overvalued in relation to the risk that damage to the reputations of a few will go unvindicated. Moreover, the danger to public safety posed by various non-governmental actors is one that is subject to significant change over time. Thus, it is more appropriate in that context to use the usual decision-making processes of government to determine which risks should be reduced at the expense of others. Such matters are therefore properly treated as being of "private concern" and speakers are properly subject to the regulation of defamation laws.

■ In view of the foregoing, we conclude that the content of Washington's letters to Ayala's employer was of private concern, and subject to defamation law, but that the content of her letter to the FAA was incidental to allegations of public concern, and therefore protected by the Constitution. Washington's letters to Ayala's employer merely communicated information regarding the alleged misconduct of a single private individual, albeit misconduct that could have a significant effect on public safety. The allegations did not, however, address any issue concerning the conduct of government or the structure of society or any social issue. There is little danger that government, acting through defamation law, will improperly weigh the social interest in communication of such information against the reputation interest of the subject of such communications. Indeed, for the reasons discussed above, where the subject matter is the safety of all, the weighing is best done through the ordinary processes of government, which are able to respond to shifts in the social value of the competing interests, whether they are caused by changes in circumstances or popular mood. In fact, the interest in airline safety implicated by Washington's communication to Ayala's employer are precisely the sort that are best evaluated and regulated through the usual non-constitutional legisla-

tive and judicial processes, because the interests at stake are shared across society.[7]

■ Washington's letter to the FAA is of a different character, however. In it, she criticizes the FAA's handling of her accusations. She asserts that the agency's failure to give credence to her charges is the result of discrimination against her as a woman and as a non-elite. Such speech is at the very core of the First Amendment; the fact that it was directed to a government agency instead of to the public at large merely brings it within an even more specific clause of the First Amendment—that which prohibits laws "abridging ... the right ... to petition the Government for a redress of grievances." Because Washington's letter to the FAA concerned such grievances, addressed to an agency of the government, we hold that it was on a matter of public concern.

### C.

### What showing of falsity was required?

Having determined that some of the defamatory statements were a matter of public concern and others were not, we now must decide what kind of showing with respect to falsity (a preponderance of the evidence or clear and convincing evidence) Ayala had to make with respect to each kind of speech to support the award of compensatory and punitive damages.

■ In *Hepps, supra,* the Court addressed the question whether to recover compensatory damages, a private-figure plaintiff bore the burden of proving falsity as well as fault where the defamatory speech was of public concern. *See* 475 U.S. at 776–78, 106 S.Ct. at 1563–65. The Court approached the problem by reasoning that the allocation of the burden of proof distributed between the parties the risk that the available evidence was unpersuasive as to truth or falsity. *See id.* at 776, 106 S.Ct. at 1563–64. The Court held that "[t]o ensure that true speech on matters of public concern is not deterred," the risk had to be assigned to the plaintiff in a defamation action. *Id.* at 776–

---

7. Washington's challenge to the judgment was solely on constitutional grounds. She did not assert that Ayala's claim was contrary to statuto-

ry or common law. Thus, we do not address that issue.

77, 106 S.Ct. at 1564. The Court held, in the context of compensatory damages, that the risk was sufficiently managed if the plaintiff was required to show falsity by a preponderance of the evidence, without need to make a showing by clear and convincing evidence. *Id.* Applying *Hepps* to the present case, we hold that the trial court erred in setting aside the jury's award of compensatory damages because the jury found that Ayala, a private figure in a case involving matters of public as well as private concern, had shown all three elements of defamation by at least a preponderance of the evidence.

The Supreme Court has not yet ruled on the question whether a private-figure plaintiff must show falsity by clear and convincing evidence to recover punitive damages. *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 661 n. 2, 109 S.Ct. 2678, 2682 n. 2, 105 L.Ed.2d 562 (1989); *Auvil v. CBS "60 Minutes"*, 836 F.Supp. 740, 742 (E.D.Wash.1993), *aff'd*, 67 F.3d 816 (9th Cir.1995), *cert. denied*, — U.S. —, 116 S.Ct. 1567, 134 L.Ed.2d 666 (1996). The present case squarely presents us with the question of Ayala's entitlement to punitive damages. Looking to the Court's analysis in *Hepps* for guidance, we first note that Ayala, unlike Hepps, has shown by clear and convincing evidence that the defendant acted with constitutional malice. To decide how persuasive the evidence of falsity must be for the plaintiff to prevail, we are guided by the purpose of punitive damages. In these circumstances where a jury has determined that the defendant's conduct has been proven, by clear and convincing evidence, to constitute constitutional malice, we do not think that any greater certainty is necessary with respect to falsity than proof by a preponderance of the evidence.

Punitive damages "are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence." *Gertz, supra*, 418 U.S. at 350, 94 S.Ct. at 3012. The reprehensible conduct that is sought to be punished and deterred is speaking with constitutional malice, that is, with actual knowledge of the falsity of the speech or reckless disregard of it. Once a defendant has done that, it is mere fortuity if what was said should happen to turn out to be true. What is punished is the creation of an unwarranted risk, not the actual harm that results from the risk. *See TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 459–60, 113 S.Ct. 2711, 2721, 125 L.Ed.2d 366 (1993) (plurality opinion) (stating that any constitutional limitation on award of punitive damages relates not only to actual damages, but to injury that *could* have flowed from conduct); see also *id.* at 466–68, 113 S.Ct. at 2725 (Kennedy, J., concurring in the judgment) (endorsing "objective indicia of reasonableness" discussed by plurality); *id.* at 484, 113 S.Ct. at 2734 (O'Connor and White, JJ., concurring in the judgment) ("I have no quarrel with the plurality that, in the abstract, punitive damages may be predicated on the potential but unrealized harm to the victim, or even on the defendant's anticipated gain."); *cited with approval in BMW of N. Am., Inc. v. Gore*, — U.S. —, —, 116 S.Ct. 1589, 1602, 134 L.Ed.2d 809 (1996).

Although it is appropriate to require proof of falsity as a check on vexatious lawsuits concerning circumstances in which no cognizable harm could accrue to the plaintiff, once that hurdle has been passed, there is no constitutional concern requiring greater certainty of proof with respect to falsity. Of course, just as "[a] jury is obviously more likely to accept a plaintiff's contention that the defendant was at fault in publishing the statements at issue if convinced that the relevant statements were false," *Hepps, supra*, 475 U.S. at 778, 106 S.Ct. at 1565, a jury is more likely to find proof of constitutional malice by clear and convincing evidence if it is shown by similarly persuasive evidence that the statement was false. Thus, "our decision [affects] only marginally ... the burdens that the plaintiff must already bear as a result of [the Court's] earlier decisions in the law of defamation." *Id.*

## IV.

As an alternative ground for granting judgment as a matter of law on punitive damages, the trial court cited the fact that the jury awarded Ayala only nominal compensatory damages. The trial court was in-

correct in basing its judgment on that fact. Under the law of the District of Columbia, although there must be a *basis* for compensatory damages before punitive damages will be considered, *Street v. Hedgepath,* 607 A.2d 1238, 1248 n. 9 (D.C.1992) (citing *Vassiliades v. Garfinckel's,* 492 A.2d 580, 593 (D.C.1982)) a plaintiff need not prove anything more than nominal actual damages to justify the imposition of punitive damages. *Robinson v. Sarisky,* 535 A.2d 901, 907 (D.C.1988). Moreover, as noted above, any constitutional limitation on the award of punitive damages relates not only to actual damages, but to the injury that *could* have flowed from the conduct, *see TXO Prod. Corp., supra,* 509 U.S. at 465, 113 S.Ct. at 2724 (affirming West Virginia Supreme Court of Appeals holding that "defendant could be liable for punitive damages, even if the jury did not award the plaintiff any compensatory damages"), as well as the reprehensibility of that conduct. *BMW of N. Am., supra,* —— U.S. at ——, 116 S.Ct. at 1599 ("Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.") (citation omitted). Although Washington's statements did not result in Ayala losing his job or suffering any other government or employer sanction, they were of such a nature as to create a significant risk of consequences of that magnitude, and they were proven to have been made with constitutional malice. The jury award of $1.00 in punitive damages, equal to the award of $1.00 in compensatory damages is not, on its face, suspect, and may reflect no more than the jury's predicament in the absence of evidence going to punitive damages. As the Supreme Court recently noted,

> Of course, we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual *and potential* damages to the punitive award. *TXO,* 509 U.S. at 458 [113 S.Ct. at 2720].... Indeed, low awards of compensatory dam-

ages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine. It is appropriate, therefore, to reiterate our rejection of a categorical approach. Once again, "we return to what we said ... in [*Pacific Mut. Life Ins. Co. v.*] *Haslip* [499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)]: 'We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that [a] general concer[n] of reasonableness ... properly enter[s] into the constitutional calculus.'" *TXO,* 509 U.S. at 458 [113 S.Ct. at 2720].... In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis. When the ratio is a breathtaking 500 to 1, however, the award must surely "raise a suspicious judicial eyebrow." *TXO,* 509 U.S. at [481] 482 [113 S.Ct. at 2732].... (O'Connor, J., dissenting).

*BMW of N. Am., Inc., supra,* —— U.S., at —— – ——, 116 S.Ct., at 1602–03. Therefore, the trial court's grant of judgment as a matter of law on punitive damages cannot be sustained on any alternative ground.

## Conclusion

 The trial court erred in requiring Ayala to make a stronger showing to establish his claim to compensatory and punitive damages from Washington. Therefore, its judgment must be reversed. Furthermore, the trial court precluded Ayala from introducing evidence bearing on punitive damages, including evidence of his attorney fees and costs. In this jurisdiction, such evidence is admissible as a factor in assessing punitive damages. *Town Ctr. Management Corp. v. Chavez,* 373 A.2d 238, 246 (D.C.1977). Therefore, the case must be remanded for

further proceedings quantifying punitive damages.

*Reversed and remanded.*