**James S. MAXWELL, and Robert H. Bear, Appellants,**

**v.**

**Eugene J. GALLAGHER, Daniel J. O'Lone, and Gallagher & Co., Appellees.**

**Nos. 96–CV–199, 96–CV–591.**

District of Columbia Court of Appeals.

Argued Feb. 23, 1998.

Decided April 2, 1998.

Joseph R. Whaley, Rockville, MD, for appellants.

George A. Fisher, with whom Jacob A. Stein, Washington, DC, was on the brief, for appellees.

Before STEADMAN, FARRELL, and REID, Associate Judges.

FARRELL, Associate Judge:

This appeal from a judgment and award of damages for breach of fiduciary duty requires us, *inter alia,* to consider once again the relationship between compensatory (or actual) and punitive damages. Because the trial judge as factfinder expressly found that the appellees (counter-claimants) had not

proven a basis for an award of actual damages, we hold that the judge's award of punitive damages was impermissible. We reverse that award but otherwise affirm the judgment.

## I.

Plaintiff James S. Maxwell sought a declaratory judgment in Superior Court confirming the right of the law firm Maxwell & Bear to retain its ownership of eleven shares of stock in Gallagher & Co., Real Estate, Inc., of which Maxwell and Robert H. Bear had been directors and Maxwell an officer. The remaining owners of the corporation, Eugene J. Gallagher and Daniel J. O'Lone, as well as the corporation (collectively "the appellees"), answered and filed a counterclaim adding Bear as a counter-defendant. They sought rescission of the stock transfer to Maxwell & Bear primarily on grounds of breach of fiduciary duty by the firm in providing legal representation to the corporation and the other owners. Following a bench trial, Judge Mitchell–Rankin issued an exhaustive written order and opinion concluding that Maxwell and Bear each had furnished legal representation to the corporation and Messrs. Gallagher and O'Lone during the relevant times and had breached their resultant fiduciary duty by placing their personal interest in controlling the corporation ahead of the interests of the clients. The judge ordered rescission of the stock held by Maxwell & Bear, awarded $1 in nominal damages to the appellees after finding no support for an award of actual damages, and ordered Maxwell and Bear to pay $75,000 in punitive damages.

## II.

The trial judge found that Maxwell & Bear undertook to represent the corporation and its principals at meetings in December 1987 and January 1988 during which the division of ownership shares in the closely-held corporation was negotiated and agreed upon, resulting in the allocation of eleven of the one hundred shares to the law firm of Maxwell & Bear. The judge further found that Maxwell [1] undertook the representation "under circumstances where the interest between the members [including Maxwell & Bear] and the corporate client were not compatible, and under circumstances where the law firm fostered and exploited the divergence." In particular, the stock division, including "the equity interest ... solicited and obtained by the law firm ... was not consummated to facilitate the best interest of the corporation, but only to satisfy the demands of ... [individual members] and the law firm." [2] Moreover, from the beginning of the attorney-client relationship, Maxwell had never disclosed to, or discussed with, the other principals the possible conflicts of interest that relationship entailed. By engaging in this course of "double dealing" designed to insure themselves effective control of the corporation, the judge found that Maxwell and Bear breached fundamental attorney-client obligations as reflected in multiple provisions of the District of Columbia Code of Professional Responsibility. *See, e.g.,* DR 5–101, –104, –105; EC 2–19, 5–3, –16, –18 (1986).[3]

On appeal, Maxwell and Bear primarily dispute the trial judge's finding that they undertook legal representation of the other principals in connection with the division of the stock. They concede that they represented Gallagher, O'Lone, and Pollard on other matters (indeed, they so stipulated at trial), but argue that when it came to the pivotal meetings at which the stock division was negotiated, all present knew that Maxwell and Bear "were there for their own business reasons."

---

**1.** The judge found that "[t]hroughout the events which are the subject of this action, Mr. Maxwell was the primary actor," but that "his acts are imputed to the law firm and the remaining partner, Mr. Bear," who, moreover, "had knowledge of the activities of Mr. Maxwell."

**2.** The judge specifically found that two members of the corporation with ownership interests, O'Lone and William Pollard, "ow[ed] their suc-

cessful obtention of company stock to the law firm," Maxwell's design being to combine their aggregate 40% ownership with the law firm's 11% so as to give Maxwell & Bear effective control of the corporation.

**3.** In 1991, after the primary conduct at issue here, the Code was replaced by the District of Columbia Rules of Professional Conduct.

When a case has been tried without a jury, this court "may review both as to the facts and the law, but the judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it." D.C.Code § 17–305(a) (1997). Whether the legal representation Maxwell and Bear provided to the corporation or principals extended to the stock division is at best a mixed question of fact and law requiring substantial deference to the factfinder insofar as the answer turns on the parties' understanding. *Cf. Edmund J. Flynn Co. v. LaVay,* 431 A.2d 543 (D.C. 1981) (reviewing under aegis of § 17–305(b) trial court's findings with respect to parties' intention to form a contract). Significant first is that Maxwell and Bear do not deny that they purported to represent the *corporation* with regard to the stock division. They contend that "[t]here is no evidence to support any finding that the attorneys ever undertook any professional responsibility in connection with the issuance of the stock ... *other than* to the corporation" (emphasis added). Yet in that admitted capacity, they concede that they owed a fiduciary duty, *see Egan v. McNamara,* 467 A.2d 733, 738 (D.C. 1983), and the trial judge expressly found that they had placed their private interest in securing control of the corporation above the interests of the corporate client.[4]

Moreover, there is ample record support for the judge's finding that the law firm purported to represent the other principals at the stock division meetings. Those meetings took place against the background of a course of dealing starting in 1984 during which Maxwell and Bear played the "dual/multiple roles" of business associates and legal counsel to Gallagher, including when jointly forming a predecessor company in 1986. As a later illustration, the judge found that Gallagher "sought and received legal advice from Mr. Maxwell as to the most appropriate time to resolve Mr. Pollard's interest in the company," an important issue because Pollard faced collateral legal (and potential criminal) liability at the time he joined the corporation. Indeed, the December 18, 1997 meeting at which the stock division became the paramount subject was originally called by Maxwell, at Gallagher's request, to discuss a real estate commission dispute the company had had with another real estate firm, "a matter in which Maxwell & Bear served as legal counsel for Messrs. Gallagher, Pollard, and O'Lone." According to testimony by O'Lone, Maxwell expressly justified the law firm's demanded percentage ownership as payment for the ongoing representation it was providing to and on behalf of the company and its principals. In short, we find no reason to disturb the finding of a legal relationship between Maxwell & Bear and the others extending through the stock division and beyond.[5]

Nor will we disturb the finding that appellants breached the duties imposed by that relationship by failing to disclose the business advantages they sought which "might affect the firm's legal judgment vis-a-vis Mr. Gallagher" and by acting repeatedly to effectuate their own interests at the expense of the other principals.

> The relation of attorney and client is one of the highest trust and confidence, and demands the utmost good faith on the part of the attorney. This relation is not only highly confidential, but presents so many opportunities for the reaping of special benefits at the expense of the client by an attorney so disposed, that courts will close-

---

4. Only self-dealing, the judge found, explained the later arrangement for sale of Pollard's stock to O'Lone, whom Maxwell reasonably believed he could control, at a price "set by Mr. Pollard, in consultation with Mr. Maxwell," the result of which was to "seal [the law firm's] leverage, ... influence and ... percentage interests in the corporation."

5. Not long after the January 1988 meeting at which the stock division was completed, Maxwell finally advised Gallagher to acquire independent counsel and recommended attorney Robert Courtland. But, as the trial judge found, Maxwell separately told O'Lone "that he recommended Mr. Courtland to serve as Mr. Gallagher's legal representative because he [Maxwell] could control Mr. Courtland." When Courtland himself subsequently told Maxwell that "because he [Maxwell] was representing Messrs. O'Lone and Pollard, Maxwell & Bear, and the corporation, ... he had numerous conflicts and was wearing too many hats," Maxwell "replied that he would handle things so that everything turned out all right."

ly scrutinize any transaction in which the attorney has assumed a position antagonistic to his client.

*Goodrum v. Clement,* 51 App. D.C. 184, 189, 277 F. 586, 591 (1922). In thus "scrutiniz[ing]" the relationship at hand, the trial judge found ample reason, as do we, to conclude that

> [t]he law firm acted in complete disregard of the interests of the corporate client and Mr. Gallagher. The law firm made no disclosures to any client, obtained no informed consents from any client, and sought by its disregard of its ethical and fiduciary duties to its corporate client to benefit itself.... [6]

We therefore sustain the judge's rescission of the stock transfer "as the tangible product of the breaches of fiduciary duty."

### III.

■ Although the trial judge ordered cancellation of the stock transfer, she also found "no record evidence of any meaningful evaluation of the stock" at the time it was divided. Nor did the appellees present at trial any evidence of the dollar value of the stock. This exemplified what the trial judge found to be a complete failure of the appellees to present proof of loss from the breach of duty for which compensatory damages could be awarded. Maxwell and Bear argue that, in the absence of such proof, it was error for the trial judge to award punitive damages. We are constrained to agree. Despite some uncertainty in our decisions over the years, *see Dyer v. Bergman & Assoc.,* 657 A.2d 1132, 1140 n. 12 (D.C.1995), the principle we derive from them is that, before punitive damages may be awarded, there must be a basis in the record for an award of actual damages, even if nominal. Since the trial judge expressly found no such basis in the record of this case, punitive damages will not lie.

### A.

In her original opinion, the judge denied the counterclaim "with respect to compensatory damages, in the absence of proof of the same," but awarded $75,000 in punitive damages for the breach of fiduciary duty. The appellees then moved to amend the judgment "solely [for the court] to make an express finding that they are entitled to compensatory damages in at least a nominal amount." The judge modified her order by awarding appellees "nominal damages in the amount of $1.00," but she made explicit that this was not an award for actual damages because the appellees had shown no basis for such compensation. The judge distinguished between proof of "injury" and "evidence of any loss occasioned by" the injury. Referring to her original finding that "[t]he harm ... caused to the corporation as a client and to Mr. Gallagher as a client by the law firm's cavalier and self-interested approach to its ethical and fiduciary duties is amply demonstrated by the facts in this case," she continued:

> Although this Court does agree there is ample justification for a finding of injury as provided in the [original] order, it does not concur with [appellees] that they are entitled to compensatory damages. The reason is simple: [they] have failed to produce evidence *of any loss* occasioned by [Maxwell's and Bear's] conduct for which they should be compensated.
>
> ... [H]aving proven *only breach of fiduciary duty, and hence injury,* [appellees] are entitled only to a nominal damage award but are not equally entitled to a corresponding compensatory damage award. [Emphases added.]

The judge, quoting *Chesapeake & Potomac Tel. Co. v. Clay,* 90 U.S.App. D.C. 206, 208, 194 F.2d 888, 890 (1952), thus awarded nominal damages of $1.00 as what she believed to be the required—and sufficient—predicate for punitive damages to a "plaintiff whose legal right has been technically violated but has proved no real damage." In a word, the

---

6. Only one of "the most blatant examples" of this, the judge found, was Maxwell's first "advis[ing] Mr. Gallagher that resolution of Mr. Pollard's ownership interest ... should await resolution of his [Mr. Pollard's] legal difficulties,"

then, "in an about face," providing "contrary advice to Mr. Pollard to move with dispatch in obtaining an interest in the corporation" by which Pollard became beholden to Maxwell.

breach of fiduciary duty without more supplied the basis for the punitive damage award.

## B.

First of all, we reject the appellees' assertion that the trial judge found actual damages but was merely unable to quantify them—the $1.00 in nominal damages being a proxy for that indeterminate but actual loss. The appellees alleged only economic damages, something not inherently impossible to quantify if they had been proven. *Cf. BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 581–83, 116 S.Ct. 1589, 1602, 134 L.Ed.2d 809 (1996) (higher ratio of punitive to compensatory damages may be justified where "the monetary value of *non*-economic harm might have been difficult to determine") (emphasis added). More importantly, the judge took pains to state repeatedly that the appellees had "failed to produce evidence of any loss"— hence any compensable damage—resulting from the breach of fiduciary duty.[7] We therefore must decide whether the award of punitive damages was permissible without proof that actual damages were warranted.

We think the essence of our case law is this: A plaintiff must prove a basis for actual damages to justify the imposition of punitive damages. The amount of such damages may be nominal, stemming from the difficulty of quantifying them or from some other cause.[8] But without proof of at least nominal *actual* damages, punitive damages may not be awarded.

Our most recent statement of this rule was in *Ayala v. Washington*, 679 A.2d 1057 (D.C. 1996). There we said:

> Under the law of the District of Columbia, although there must be a *basis* for compensatory damages before punitive damages will be considered, a plaintiff need not prove anything more than nominal actual

damages to justify the imposition of punitive damages.

*Id.* at 1070 (emphasis in original; citations omitted). This requirement of a "basis" in proof for "actual damages," if only nominal, is in accord with virtually all of our decisions in recent years. At least since *Franklin Investment Co. v. Smith*, 383 A.2d 355 (D.C. 1978), we have read the seminal decision of *Wardman–Justice Motors, Inc. v. Petrie*, 59 App. D.C. 262, 266, 39 F.2d 512, 516 (1930), to prohibit punitive damages unless there is a "basis for an award of compensatory damages." 383 A.2d at 358. Following *Franklin Investment*, we stated in *Bay General Industries, Inc. v. Johnson*, 418 A.2d 1050 (D.C. 1980), that "actual damages are a prerequisite to exemplary or punitive damages in this jurisdiction." *Id.* at 1058 n. 21 (D.C.1980). Citing those two cases, we next held in *Vassiliades v. Garfinckel's, et al.*, 492 A.2d 580 (D.C.1985), that since "there was no basis for an award of compensatory damages ... there is also no basis for punitive damages." *Id.* at 593. And succeeding cases have confirmed that "a verdict assessing punitive damages can be returned only when there is also a verdict assessing compensatory or actual damages," even if nominal. *Pyne v. Jamaica Nutrition Holdings Ltd.*, 497 A.2d 118, 133 (D.C.1985); *see also Robinson v. Sarisky*, 535 A.2d 901, 907 (D.C.1988) (plaintiff must at least prove "nominal actual damages to justify the imposition of punitive damages"); *Zanville v. Garza*, 561 A.2d 1000, 1001 (D.C.1989); *Street v. Hedgepath*, 607 A.2d 1238, 1248 n. 9 (D.C.1992); *Bernstein v. Fernandez*, 649 A.2d 1064, 1073 (D.C.1991) ("An award of punitive damages cannot stand alone, unaccompanied by compensatory damages."). This rule accords with the law of our sister jurisdiction, Maryland. *See Shell Oil Co. v. Parker*, 265 Md. 631, 291 A.2d 64, 71 (1972) (rejecting availability of punitive damages for "only a technical invasion of the

---

7. Conceivably, the judge could have found such loss to the corporation and other principals in the form of the promissory note that was taken out to pay Pollard what appeared to the judge to be an inflated buy-out sum for his stock ownership. But she did not, perhaps because of the absence of any proof of value of the stock. Significantly, appellees have not cross-appealed

from the refusal to award compensatory damages.

8. For example, had any valuation been made of the corporate stock, the judge might have concluded that rescission of the transfer to Maxwell & Bear remedied the loss to the corporation and obviated the need for actual damages.

plaintiff's rights" and holding that there must be "at least a showing of compensable injury, that is, an award of nominal compensatory damages, before a recovery of punitive damages is allowed").[9]

In awarding punitive damages despite the absence of a basis for actual damages, the trial judge relied partly on the following passage from *Brown v. Coates*, 102 U.S.App. D.C. 300, 304, 253 F.2d 36, 40 (1958):

> [O]nce it has been shown that one trained and experienced holds himself out to the public as worthy to be trusted for hire to perform services for others, and those so invited do place their trust and confidence, and that trust is intentionally and consciously disregarded, and exploited for unwarranted gain, community protection, as

well as that of the victim, warrants the imposition of punitive damages.

The cogency of this reasoning is indisputable, but *Brown* does not bear upon the issue presented here of the necessity *vel non* of proof of actual damages before punitive damages may be awarded.[10] We hold that, because the trial judge expressly found that appellees had proven no actual damages, punitive damages could not be awarded.

*Affirmed in part and reversed in part.*

---

9.   We need not explore here whether such a nominal award of compensatory damages may affect significantly the permissible amount of punitive damages.

10.   In *Brown* the jury had awarded actual damages of some $7,000. *See* 102 U.S.App. D.C. at 303, 253 F.2d at 39; *see also Wagman v. Lee*, 457 A.2d 401 (D.C.1983) (sustaining punitive damage award for breach of fiduciary duty relying partly on *Brown*, where jury had also awarded $4,000 in actual damages).